ROCK CREEK ALLIANCE, Cabinet Resource Group, Sierra Club, Trout Unlimited, Idaho Council of Trout Unlimited, Mineral Policy Center, Pacific Rivers Council, and Alliance for the Wild Rockies, Plaintiffs,

v.

UNITED STATES FISH & WILDLIFE SERVICE, Defendant,

and

Revett Silver Company, Intervenor.

No. CV 01–152–M–DWM.

United States District Court,
D. Montana.

March 28, 2005.

Todd D. True, Seattle, WA, Douglas L. Honnold, Stephen D. Mashuda, Timothy J. Preso, Bozeman, MT, for Plaintiffs.

William W. Mercer, Billings, MT, Timothy J. Racicot, Ruth Ann Lowery, Washington, DC, for Defendant.

Darin W. Johnson, Christopher Mangen, Jr., Billings, MT, for Intervenor.

## ORDER

MALLOY, Chief Judge.

### I. Introduction and Factual Background

Plaintiffs challenge the United States Fish and Wildlife Service's ("FWS") issu-

ance of a biological opinion (BiOp) that will permit construction and operation of Revett Silver Company's Rock Creek copper and silver mine in Sanders County, Montana. The BiOp concludes that the mine will not jeopardize the continued existence of grizzly bears in the Cabinet–Yaak ecosystem or the Columbia River Basin bull trout Distinct Population Segment (DPS) and will not adversely modify the bull trout's critical habitat.[1]

The mine project will include a railroad station, a pipeline, powerlines, a tailings treatment plant, and other infrastructure, covering 1,560 acres of public and private land in the Cabinet Mountains. The project requires several miles of road construction and reconstruction. The mine would run under the Cabinet Mountain Wilderness Area, with support facilities in the Kootenai National Forest; therefore, the Forest Service must approve a permit for the mine. The Forest Service's Biological Assessment indicated the mine was "likely to affect" threatened or endangered species, triggering the need for formal consultation with FWS. FWS issued a BiOp in 2000 that found the mine would likely jeopardize the continued existence of the Cabinet–Yaak grizzlies unless special measures were taken to protect the bears. Plaintiffs sued in 2001. This Court remanded the BiOp to FWS, which issued an amended BiOp in 2003. That BiOp concluded that the modified proposed mine (which is less extensive than the original proposal) posed "no jeopardy" to threatened or endangered species.

Plaintiffs challenge this "no jeopardy" finding for grizzly bears and bull trout, claiming both are so imperiled in the Cabinet Mountains as to make the FWS's decision to allow the project arbitrary, capricious, and an abuse of discretion in violation of the Endangered Species Act § 7, 16 U.S.C. § 1536 and the APA, 5 U.S.C. §§ 701–706. Plaintiffs' First Amended Complaint, filed on July 10, 2003, has three claims for relief: that FWS' "conclusion that the proposed Rock Creek Mine will not jeopardize the Cabinet–Yaak grizzly bear population is not justified by the best available science," in violation of ESA and APA; that FWS' reliance on a mitigation plan that allows acquisition of replacement habitat after the mine is built is an "irreversible commitment of resources" in violation of ESA (16 U.S.C. 1536(d)) & APA; and that the mine will jeopardize the survival and recovery of the Columbia River bull trout DPS, in violation of ESA and APA. Plaintiffs request the Court to declare that FWS has violated ESA § 7 and its implementing regulations regarding both grizzly bears and bull trout in the Rock Creek Biop, set aside the BiOp, and enjoin FWS from authorizing any take of those species pending compliance with ESA.

There are currently five motions pending before the court. First, Defendant's move to strike extra-record exhibits submitted by the Plaintiffs. The contested documents include several previous FWS biological opinions, a declaration by Plaintiffs' expert, a FOIA request response, and a scientific thesis referred to in the BiOp. For the reasons detailed below, the court will consider the bull trout and grizzly previous BiOps, the FOIA response, and the Harris thesis, because they fit into a well-established exception to the administrative record review requirement. The Frissell declaration will not be considered. The allowed documents illuminate the question of whether FWS properly considered all relevant factors and made a rational decision based on them. The Frissell Declaration amounts to an impermissible battle of the experts.

1. There is no critical habitat designated for the grizzly bear.

Second, Plaintiffs move to submit extra-record evidence. The extra-record evidence in this motion is post-decisional information that was not available to the agency in this form at the time of the decision. As explained further below, the evidence therefore does not fit into any exception to the rule that the Court's reviews agency action based on the administrative record. The motion is denied.

Finally, the Court considers the question of summary judgment. Plaintiffs, the United States and Intervenor Revett Mining Company have all moved for summary judgment. The Court will grant summary judgment in part to all parties. Summary judgment on Claim II will be granted to FWS and Revett. Plaintiffs will be granted summary judgment on Parts of Claims I and III.

## II. Analysis[2]

### A. Motion to Strike

FWS moves to strike certain documents offered in support of Plaintiffs' motion for summary judgment. These are Exhibits 1–4, 10–36, and 39. Defendant also wants the court to ignore those parts of Plaintiffs' summary judgment argument that rely on these exhibits. If the Court does not strike the material, Defendant wants an opportunity to file contradictory evidence. Because the Plaintiffs rely so heavily on the extra-record evidence to support their case, it is necessary to address the motion to strike prior to addressing the motions for summary judgment.

■ Generally, the court should review agency action based only on the information before the agency at the time of decision. *Southwest Center for Biological Di-*versity v. U.S. Forest Service, 100 F.3d 1443, 1450 (9th Cir.1996). FWS argues that the documents are outside the administrative record and therefore should not be considered in an APA case. There are, however, limited circumstances in which extra-record review is allowed in the Ninth Circuit. Defendant argues that Plaintiffs have not shown any of these exceptions apply to this case. Def.'s br., 5–7.

The documents at issue are the following:

*Exhibits 1–3* are three BiOps produced by the FWS Montana field office that characterize the grizzly bear situation differently, Plaintiffs allege, from the Rock Creek BiOp.

*Exhibit 4* is Richard Harris' 1984 master's thesis, on which much of the analysis of grizzly bear "harvest" numbers is based. Defendant claims this 1984 information is redundant and unnecessary because more recent studies by the same author are included in the administrative record. Plaintiffs argue that the manner in which Harris (1984) is cited in the administrative record's Harris (1986) article demonstrates that FWS misapplied Harris' study to the Cabinet grizzly population. Pl.'s br., 9–10.

*Exhibits 10–19* are previous biological opinions regarding bull trout. Plaintiffs highlight FWS' previous conclusions that preservation of all subpopulations of Columbia River Basin DPS bull trout is necessary to avoid jeopardy to the DPS. Pl.'s br., 6. Plaintiffs argue that this discrepancy with the Rock Creek BiOp is not offered to prove their disagreement with the new BiOp's conclusions, but rather to show

**2.** The Government's briefs look like they do not comply with the Local Rule for formatting. The Court ordered the briefs refiled in conformance with the rule, and the new briefs are exactly the same. On the motions to strike and to submit evidence, this advantageous formatting does not matter because the briefs are shorter than the allowed number of pages. But on the summary judgment motions, Defendant appears to gain about 3–4 pages by its formatting, including the extreme use of footnotes, which allows single-spacing. The court disregards the arguments and authority set forth in the multiple footnotes.

it is arbitrary for FWS to have taken these different views on the same subject. Pl.'s br., 6.

*Exhibits 17 and 20–36* are also bull trout BiOps. Plaintiffs argue that these additional BiOps show the potential for cumulative effects given the number of projects that may impact the bull trout. Pl.'s br., 7.

Plaintiffs contend these exhibits fall within exceptions to the administrative record rule that allow documents that show the agency failed to consider relevant factors and that explain complex matters, the first and third exceptions outlined in *Southwest Center.* Pl.'s br., 2. Plaintiffs argue that the crux of the issue is what FWS failed to do or consider, not the specific results of its consideration. In particular, Plaintiffs believe the Court should consult other biological opinions regarding these species and the factors those opinions deemed important, in order to determine whether FWS considered all relevant issues here. Br., 5–6.

■ The exceptions to the administrative record rule are: 1.) to ensure the agency considered all relevant factors and explained its decision; 2.) when it appears the agency has relied on documents or materials not included in the administrative record; 3.) when necessary to explain technical terms or complex subject matter involved in the agency action; or 4.) there is a strong showing of bad faith or improper behavior by the agency. *Southwest Center,* at 1450 (citations omitted.) The only real exception at play here is for "the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision." *Asarco, Inc. v. U.S. EPA,* 616 F.2d 1153, 1160 (9th Cir.1980).

"It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not. The court cannot adequately discharge its duty to engage in a "substantial inquiry" if it required to take the agency's word that it considered all relevant matters." *Id.*

### 1. Grizzly Bear BiOps

■ Plaintiffs' argument regarding the admissibility of Exhibits 1–3 refers to their summary judgment brief, which devotes considerable attention to the FWS's interpretation of various grizzly bear data. See Pl.'s Resp., 8–9. Plaintiffs' first argument is that FWS interpreted the same data it had used in similar grizzly bear BiOps but came to a different conclusion: the population is no longer "declining," it is experiencing a "decline in the rate of increase." Pl.'s Sum. Judg. Br., 4–6. The summary judgment question—whether the different interpretation is supportable—is slightly different from the admissibility question, which is whether the court should consider these documents to inform its answer to the summary judgment question. In this case, I believe the documents fit under the exception for documents that illuminate whether FWS considered all relevant factors. FWS cannot argue that it was unaware of these documents or that considering them was an additional hardship. These documents discuss the same bear population and the same scientific studies, and therefore, the Court is entitled to look at them to consider whether FWS considered all factors that it itself considered relevant in previous dealings with this bear population.

### 2. The Harris Thesis

■ Richard Harris' 1984 thesis, *Harvest Age–Structure as an Indicator of Grizzly Bear Population Status,* evaluates

the amount of human-caused mortality a model bear population can sustain without decline. Harris' model was based on a population of over 400 bears. His thesis includes statements that deny its applicability to small populations. Thesis at 173, 186–87.

FWS does not cite Harris' 1984 thesis in the Rock Creek BiOp but rather refers to Harris (1986), an appendix to the Final Programmatic EIS for the Grizzly Bear in Northwestern Montana, March 1986. AR GB 38/8335. This appendix summarizes and explains the model developed by Harris in his 1984 thesis. He mentions population size only briefly in this appendix, saying "Harris (1984) has shown that the concept of sustainable yield is not independent of the size of the population in question. Smaller populations were shown to decline at slightly smaller proportional harvests than were larger populations." AR 8335–36.

The Government argues that Harris 1984 is redundant, because Harris 1986 includes the model developed in the thesis. However, this argument appears disingenuous, given the Government's previous legal loss over the 1984 thesis. See *Carlton v. Babbitt*, 26 F.Supp.2d 102 (D.D.C.1998) (discussed further at Part C(4) below.) FWS clearly knows the thesis exists, they know it has caused them trouble before, and they appear to be trying to avoid its most troubling findings by using a subset or paraphrase of its content. Harris (1986) is a summary and application of the contents of the thesis. The thesis, as an elucidation of the contents of Harris (1986), can be included under the exceptions for factors the Government should have considered and for the explication of technical matters. Though the latter exception is generally reserved for further agency clarification, in this instance, since the document is an elaboration of the docu-

ment used by the government, I believe the exception applies.

### 3. Bull Trout BiOps

#### a. Exhibits 10–19

█ Plaintiffs' main point regarding bull trout is that in several previous biological opinions dealing with the Columbia River bull trout designated population segment ("DPS"), FWS has stated that the loss of any subpopulation of bull trout could negatively impact the Columbia River DPS. A characteristic statement of this view is "[g]iven the severely degraded status of bull trout Columbia River DPS, the maintenance of remnant bull trout subpopulations of this DPS is critical to the long-term survival ... [M]aintenance of the component subpopulations is critical to ensuring the continued survival and potential recovery of the DPS." Exh. 12 (BiOp for a Kerr Dam electrical project), 18. Similar statements are made elsewhere in a number of the extra-record biological opinions submitted by Plaintiffs. "[A]dverse effects that compromise the functional integrity of a bull trout subpopulation will be considered an appreciable reduction in the likelihood of survival and recovery of the DPS by reducing its distribution and potential ecological and genetic diversity." Exh. 14, at 15. *See also* Exh. 15 at 44, Exh. 16 at 11, Exh. 17 at 14, Exh. 18 at 18.

Plaintiffs argue these documents must be considered because "FWS' no-jeopardy determination for the Rock Creek Mine is arbitrary and capricious because it was not based on consideration of relevant factors and because it departed from prior agency positions without any rational explanation." Pl.'s Resp. Br., 5. Plaintiffs argue that FWS' conclusion that the extirpation of the Cabinet Gorge subpopulation would not jeopardize the DPS contradicts these earlier findings. Pl.'s resp. Br., 6.

Plaintiffs are correct that FWS has repeatedly stressed the importance of the subpopulations. However, in the other BiOps, various actions were allowed to proceed despite the strong language regarding the possibility of incidental take and the damage to the subpopulations. For example, FWS said "adverse effects that would tend to threaten the existence of a subpopulation constitute an unacceptable risk to the DPS ..." but then concluded that the particular project, a bridge replacement, would not constitute such a threat. Exh. 18, 18. In Exhibit 13, FWS concluded that the project was likely to adversely affect a subpopulation but not, as a result, the DPS, in part because this particular subpopulation is isolated from other subpopulations.

In the Rock Creek BiOp, the FWS concluded that "[g]iven the tenuous status of the Cabinet Gorge Reservoir bull trout subpopulation and the nature of project related impacts, the likelihood of persistence of this subpopulation may be appreciably reduced in the long term ... [T]his project is expected to have negative impacts on bull trout in one of only two occupied drainages in the subpopulation, so risk of extirpation due to environmental stochasticity is elevated." AR 24940/B-39. However, in the Rock Creek BiOp, unlike in those submitted by Plaintiffs, FWS does not speak in such stark terms about the future of the bull trout generally and the necessity of preserving as many subpopulations as possible.

The Court determines that these documents can be considered under exception one, to evaluate whether the government considered all factors. The status of the DPS throughout its range is relevant to FWS's statutory duty to consider the current status of the species.

b. Exhibits 17 and 20–36

■ Plaintiffs also argue that FWS disregarded the cumulative effects of many projects that affect bull trout throughout the Columbia River DPS. The exhibits are some additional BiOps and a FOIA response. Exhibit 36 (the FOIA response) demonstrates there are over 100 BiOps that claim to adversely affect bull trout from 1998–2001. By not reviewing these other biological opinions, the court cannot discover how many times the FWS has said "this project hurts the bull trout a little, but there are enough other subpopulations that it's not a big deal." Pl.'s br., 7. If they all concluded that subpopulations must be preserved but some damage to this particular subpopulation is acceptable, then it would be death by a thousand pinpricks.

These documents should be considered. There is a difference between not considering material that is not within the agency's possession or awareness-the record must be circumscribed somehow-and disregarding information the agency itself created. The issue here is whether the FWS legitimately chose not to include information in the record that it knew contradicted its current conclusions. Plaintiffs' footnote 4 on page 7 of its Response Brief identifies the crux of the issue. If an agency can conduct its own studies or release its own opinions and then exclude those from the record later, when they decide the same issue differently, a narrow interpretation of the record review provision could be used to insulate the agency from explaining why the same problem called for a different solution. Whether FWS considered all relevant information includes an understanding of the current status of the species and the environmental baseline. Part of that has to do with how many other projects are affecting the species. These documents will be considered.

4. Frissell Declaration

■■ Plaintiffs argue the Frissell Declaration, Exhibit 39, fits within the excep-

tion allowed for explaining difficult technical issues to the Court. Pl.'s Br., 11–13. However, as Defendant points out, this exception is generally (though not categorically) reserved for agency elucidation of its decision-making procedure. *Public Power Council v. Johnson,* 674 F.2d 791, 793–94 (9th Cir.1982); *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988). This exhibit will be stricken.

5. Conclusion

■ The parties dispute the remedy to this motion. The FWS requests remand and/or an opportunity to respond, relying on *Asarco v. U.S. EPA,* 616 F.2d 1153, 1160 (9th Cir.1980). Def.'s br., 7. Plaintiffs disagree with Defendant's request for a remand or additional briefing if the court does not strike these exhibits, arguing that this is not an "interactive process," under which FWS gets to keep trying to explain its decision until it meets the requirements of the law. Pl.'s br., 13–14.

Because consideration of these documents leads to the conclusion that remand on the merits is appropriate, a further explanation of why they were not considered would not resolve that issue. The Court will admit them, consider them, and remand on the merits.

**B. Plaintiffs' motion to submit newly obtained evidence**

■ Plaintiffs move to submit an article about the population status of the Cabinet–Yaak grizzlies co-written by Wayne Kasworm, an FWS biologist. In the article, Kasworm analyzes FWS population data through 2002, (data available prior to the completion of the Rock Creek BiOp), and concludes the grizzly population is probably declining. Pl.'s br., 2. Plaintiffs assert this information can be considered under the *Southwest Center* administrative record exception for determining whether the FWS considered all relevant factors. Plaintiffs argue that FWS based its BiOp

determination on grizzly data up to 2000, even though it had 2002 data available at the time of its 2003 BiOp. Pl.'s br., 5. FWS is statutorily required to consider "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). Plaintiffs allege FWS failed to do so, and that it had an obligation to perform trend analysis on the latest data before it issued the BiOp. Pl.'s Reply br., 3–4.

■ FWS responds that no exception allows this document because it is post-decisional information. Exception 1 only applies to information available at the time, not post-decisional information. FWS argues that although the underlying data were available prior to issuing the BiOp, Kasworm's trend analysis—the conclusion reached in his article—was not. FWS Resp., 6. FWS claims to have considered the relevant available data and, by implication, suggests it had no affirmative obligation to perform Kasworm's analyses before issuing the BiOp. FWS br., 7. The Kasworm affidavit submitted by FWS with its response demonstrates that Kasworm's trend analysis was not complete until after the BiOp was issued.

The case cited by Plaintiffs for FWS's supposed duty to make projections does not support Plaintiffs' proposition. *Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988). In that case, the plaintiffs challenged FWS' failure to complete BiOps for both the leasing and extraction phases of oil and gas projects. FWS issued a BiOp for the leasing portion but failed to look closely at the potential impacts on endangered species of the actual *use* of the lease, claiming lack of sufficient information. The Ninth Circuit determined that FWS had enough information available to make at least some educated conjectures and could not stick its head in the sand.

The situation is different here. FWS did assess population trends through 2001

and mortality data through 2002. AR 13339, 24800–806. A rational, defensible decision could be based on that information. The issue is whether, under the "best available scientific data" standard of 16 U.S.C. § 1536(a)(2), a decision based on that data without trend analysis was proper. Considering the deference due the agency's scientific reasoning, it was. The only hitch is a May 7, 2003 e-mail from Anne Vandehey in which she expresses knowledge that Kasworm's forthcoming paper would say the population of grizzlies was decreasing. AR 24688. However, this email was written two days before the BiOp was published, by which time all of the decisions had been made. FWS did not have an obligation to stop the presses and wait for Kasworm's article, because they already knew there was a distinct possibility that the population was decreasing, and the strength of Kasworm's conclusion that it was decreasing grew over time, such that the final paper made a much stronger conclusion than he was making in May of 2003.

Plaintiffs' motion to submit extra-record evidence will be denied.

## C. Summary Judgment

 Agency decisions can only be set aside under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A)); (overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).) Agency action can be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto., Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Alvarado Community Hospital v. Shalala*, 155 F.3d 1115, 1122 (9th Cir.1998). The court must ask "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... [The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made. [The] review must not rubber-stamp ... administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engineers*, 361 F.3d 1108, 1119 (9th Cir. 2004) (internal citations and quotations omitted.)

The ESA, unlike NEPA, is not simply a procedural safeguard. Though the agency has discretion to make decisions based in its expertise, the ESA expresses a legislative mandate "to require agencies to afford first priority to the declared national policy of saving endangered species." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 185, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" *Tennessee Valley*, at 194, 98 S.Ct. 2279.

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species...." 16 U.S.C. § 1531(b). Section 4(a) of the ESA authorizes the Secre-

tary to list species as either "endangered" or "threatened". 16 U.S.C. § 1533(a)(1) & (b)(1)(A). Section 9 of the ESA protects endangered species by prohibiting "taking" an endangered species unless otherwise authorized. 16 U.S.C. § 1538(a). The ESA does not contain parallel statutory prohibitions for threatened species but the Secretary may by regulation extend the prohibitions of Section 9 to threatened species. 16 U.S.C. § 1533(d). FWS has taken this step and extended the protection against take by rule to grizzly bears, with some exceptions, and bull trout present in the coterminous states of the United States. 50 C.F.R. § 17.40 (grizzly bears); 50 C.F.R. §§ 17.44(w), 17.31(a), 17.21 (bull trout).

Section 7 of the ESA requires each federal agency to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). "Jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification" of critical habitat is defined as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." *Id.*

Critical habitat has not been designated for the grizzly bear, so FWS analyzed only the jeopardy question related to bears.

Critical habitat has been proposed for the Columbia Basin bull trout DPS, however, so FWS analyzed both jeopardy and destruction or adverse modification of that proposed critical habitat. 16 U.S.C. § 1536(a).

A crucial aspect of the analysis underlying any biological opinion is the "environmental baseline," which "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02.

If FWS determines that the proposed action is not likely to jeopardize the continued existence of the species but may result in the incidental "take" of individual members, the consulting agency provides an "incidental take statement" along with the biological opinion. 16 U.S.C. § 1536(b)(4). The ITS must specify the impact of the incidental take to the species and specify "reasonable and prudent measures" ("RPMs") "necessary or appropriate" to minimize the impact of any incidental take. ESA § 7(b)(4). FWS has done so in this case. Compliance with the take statement and RPMs is voluntary, but "any taking that is in compliance with the terms and conditions specified in a written [incidental take] statement … shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(*o*)(2). In other words, an actor who ignores these measures may end up running afoul of the ESA itself if any animal dies as a result of its action.

1. FWS's motion for summary judgment

FWS' motion for summary judgment emphasizes the heavy burden Plaintiffs

bear to overcome the presumption of validity given an agency's decision. Def.'s Sum. Judg. Br., 7–9. On Claim I, the grizzly bear issue, FWS argues that it properly relied on the best scientific data available regarding grizzly mortality. FWS' Sum. Judg. Br., 15. FWS asserts its replacement habitat plan is reasonable and well-designed and that it sufficiently protects bears by requiring all replacement habitat to be secured prior to the start-up of the mine, with most acquired prior to construction. FWS' Sum. Judg. Br., 16; AR 25072 (A–71).

On Claim II, FWS argues that Plaintiffs are not entitled to relief under ESA § 7(d), as they request for the mitigation plan, because § 7(d) applies only to *action agencies* during ongoing interagency consultation. FWS' Sum. Judg. Br., 17. Therefore, it does not apply to FWS itself in issuing a BiOp, or to the agency after consultation and the biological opinion have been completed. FWS' Sum. Judg. Br., 18.

On Claim III, FWS claims its findings regarding the Columbia River bull trout DPS are based on a "rational, articulated consideration of all relevant factors." FWS' Sum. Judg. Br., 18. FWS relies on the limited scope and mobility of the Cabinet Gorge population and the improved populations of other nearby bull trout populations to support its BiOp treatment of the bull trout. FWS points out that the Clark Fork watershed is only one of at least 20 in the Columbia Basin DPS. FWS' Sum. Judg. Br., 19.

### 2. Revett Silver Company's motion for summary judgment

Revett's motion, like FWS', emphasizes the degree of deference due agency decisions. Revett's Sum. Judg. Br., 7–11. Revett points out that even less than ideal decisions are upheld under district court review. Revett's Sum. Judg. Br., 9. Re-vett's specific argument regarding Plaintiffs' Complaint are also similar to FWS'. FWS properly analyzed human-caused grizzly bear mortality. Revett's Sum. Judg. Br., 13. FWS' land acquisition mitigation plans is scientifically and legally sound. Revett's Sum. Judg. Br., 13–15. FWS has not made an illegal irreversible commitment of resources in violation of § 7(d) because land will have to be acquired before mining begins, and most will be acquired before construction begins. Revett's Sum. Judg. Br., 15. Finally, FWS' conclusions regarding bull trout consider what amounts to the insignificance of this population in the grand scheme of things and determines, with FWS expertise, that the Rock Creek subpopulation could be extirpated without ill effects to the Columbia River DPS. Revett's Sum. Judg. Br., 16–17.

Plaintiffs respond to FWS' and Revett's summary judgment motions in one brief. First, Plaintiffs claim FWS cannot rationalize its conclusion that the CYE grizzly bear population can withstand increased human-caused mortality. Pl.'s Sum. Judg. Resp. Br., 1. Plaintiffs accuse FWS of distorting data in order to reach its no-jeopardy conclusion. Pl.'s Sum. Judg. Resp. Br., 2. Plaintiffs point out that the Harris (1986) article, upon which the FWS bases its mortality numbers, says no more than 30 percent of the human mortality can be female or the mortality may "lead to chronic decline." AR 8338, 8340. At least seven of 15 known human-caused grizzly mortalities in the CYE were female, which amounts to 47 percent. Pl.'s Sum. Judg. Resp. Br., 3.

Second, Plaintiffs respond that FWS has failed to justify its mitigation plans because jeopardy cannot be avoided for sure without proof that mitigation lands will be available and acquisition of those lands is not guaranteed. In support of this point,

Plaintiffs discuss in depth *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515 (9th Cir. 1998), the case relied on most heavily by Revett in its summary judgment brief for the idea that mitigation lands need not be secured prior to the project being approved. Pl.'s Sum. Judg. Resp. Br., 4. Plaintiffs distinguish *Southwest Center,* saying that FWS in this case has admitted that certain combinations of mitigation properties are required to ensure protection. AR 23947, 25080 (A–79), 25012 (A–11).[3]

Plaintiffs claim this case is much closer in fact to *Sierra Club v. Marsh,* 816 F.2d 1376, 1379 (9th Cir.1987), in which specific parcels had been identified as requiring protection. Plaintiffs emphasize the difficulty of acquiring appropriate properties, stating that the Forest Service has been trying for almost two decades to purchase some of the mitigation properties. Pl.'s Sum. Judg. Resp. Br., 5–6.

Third, Plaintiffs take on Revett's assertion that the mitigation plan poses "no danger of irremediable consequences," in violation of § 7(d). Pl.'s Sum. Judg. Resp. Br., 8. FWS' mitigation plan defers acquisition of nearly a quarter of the mitigation property, 566 acres, until the mine is constructed and operation is set to begin. Though only 1,219 acres of mitigation habitat will be acquired, the BiOp estimates the mine will displace bears from over 7,000 acres of habitat. AR 25054 (A–53), 25068 (A–67), 25073 (A–72). Given the uncertain success of these acquisitions, according to Plaintiffs, FWS cannot be sure jeopardy will be avoided, since the mine will already have been built and bears will

have been displaced. Pl.'s Sum. Judg. Resp. Br., 8–9.

Plaintiffs counter FWS' argument that § 7(d) does not even apply in this case by pointing out that FWS itself acknowledges that consultation necessarily will be ongoing, since FWS must approve the mitigation habitat acquisitions. Pl.'s Sum. Judg. Resp. Br., 9. "Plaintiffs agree that the prohibitions of 16 U.S.C. § 1536(d) apply to the action agency (here the Forest Service) rather than FWS. See Fed. Mem. At 17. However, by authorizing Forest Service activities that violate § 1536(d), FWS itself has acted arbitrarily, capriciously and contrary to law in violation of 16 U.S.C. § 1536(a)(2)." Pl.'s Sum. Judg. Resp. Br., 10, n. 6.

Fourth, Plaintiffs argue that withdrawal of the Noranda mine, which both Revett and FWS suggest remedies the jeopardy concerns addressed in the original BiOp, is not sufficient to ameliorate all bear concerns. Pl.'s Sum. Judg. Resp. Br., 10. Enough impacts are identified that flow solely from the Rock Creek mine that Noranda's removal is insufficient. Pl.'s Sum. Judg. Resp. Br., 10.

On the issue of bull trout, Plaintiffs argue first that neither FWS nor Revett explains or justifies the FWS' apparently new position that the possible extirpation of a bull trout subpopulation does not jeopardize the Columbia River bull trout DPS. Pl.'s Sum. Judg. Resp. Br., 12. Such a radical shift in view, without apparent justification, is contrary to law, Plaintiffs claim, citing *Bush–Quayle '92 Primary Committee, Inc. v. Federal Election Comm'n,* 104 F.3d 448, 453 (D.C.Cir.1997). FWS is obligated to consider jeopardy in

---

**3.** Plaintiffs make a misleading statement in their brief here, stating "Yet the agency's own biologist has raised the possibility that 'there are absolutely no willing sellers for acquistion [sic] or easement esp on the key parcels.'"

This quotation of an FWS internal email is almost accurate, except in the email the person says "what if …" Plaintiffs' framing of it makes a mountain out of a rhetorical molehill and is therefore misleading.

the context of the entire DPS, not just in one subbasin. Pl.'s Sum. Judg. Resp. Br., 13–16; 50 C.F.R. § 402.14(g)(2)-(4). *See also* Exh. 37, FWS Consultation Handbook, 4–36.

Next, Plaintiffs contend that FWS' willingness to allow extirpation of any subpopulation is improper. Pl.'s Sum. Judg. Resp. Br., 16–19; Exh. 10 at 16.

3. Plaintiffs' motion for summary judgment

Plaintiffs' summary judgment brief is, in many ways, a mirror image of their response brief. Plaintiffs argue that FWS' no-jeopardy conclusion for grizzlies is arbitrary and capricious, because the population is already declining and the FWS mitigation plan is insufficient to insure survival of the species. Pl.'s Sum. Judg. Br., 4–13. Second, it is arbitrary to claim the mine will not jeopardize the bull trout, when the FWS has repeatedly stated that each subpopulation is crucial to bull trout survival. Pl.'s Sum. Judg. Br., 13–15. Plaintiffs allege FWS' trout analysis in this new biological opinion is not fresh, but rather a retread of the original BiOp. See AR 23857; 23856. Plaintiffs claim FWS' failure to analyze authorized take throughout the Columbia River DPS—not just focusing on the subpopulation in this project-violates ESA. Pl.'s Sum. Judg. Br., 16–20.

4. Analysis

 a. *Claim I: Grizzly bears*

 There are two parts to this claim: first, that FWS has improperly concluded that the grizzly bear population can absorb any additional mortality, and second, that the habitat mitigation measures will alleviate these losses, both in violation of 16 U.S.C. § 1536(a)(2).

There are two aspects to the grizzly bear population analysis, its current status and predictions of what will happen with the mine running. The current status, as established in the administrative record, was that "[m]ost recent population trend information is statistically inconclusive, though the point estimate of the rate of increase declined during 1999 to 2000 (Kasworm et al.2000, Kasworm 2001)." AR 25026 (A–25). In the underlying unpublished report in the record, "Preliminary Grizzly Bear Trend Estimates in the Cabinet–Yaak Recovery Zone, 1983–2000, Kasworm concluded there was a 60.8% chance the population was decreasing but that confidence intervals were too wide to say that with scientific certainty, after 5000 iterations of his model."[4] AR 13339. FWS spins this as a forty per cent chance the population is going up, and that is enough for them. FWS Resp. Br., 3, FN 3. FWS acknowledges the uncertainty expressed in the BiOp and argues that making its decision cautiously, in the face of such uncertainty, fulfills its ESA obligation. FWS Resp. Br., 3–4.

However, FWS concluded the mine "should not lead to imminent decline" (AR 25106) yet there is other evidence in the record that the population is decreasing or at least not increasing. Exh. 1, at 7; Exh. 2, at 11–12; Exh. 3 at 41; AR 25026; AR 13666–67 (not reaching any of the grizzly recovery goals in 2002.) FWS even concluded that "reclassification of grizzly bears ... in the combined Cabinet–Yaak/Selkirk recovery zones of Idaho, Montana, and Washington from threatened to endangered status is warranted but precluded ..." on May 17, 1999, prior to the spike in mortality scene in the CYE in the last few years. AR 4858 (64 FR 26725). FWS concludes the CYE population could

---

4. One wonders why the FWS biologist would not run as many iterations of his model as

needed to reach acceptable confidence intervals.

absorb the loss of one additional bear during the life of the mine. AR 25111, 25113. The record shows that females are already killed at a rate above the Recovery Plan's recommended 30% of mortality. AR 9587.

Deciding this issue is quite difficult, because deference is due the agency, and they have decided that the apparent risk is worth taking. FWS' decision does not directly contravene the evidence, it considers truly equivocal evidence and decides. But a tie in the evidence should go to the species, especially because of female mortality. FWS must demonstrate a rational explanation for its conclusions, and given the clear possibility that bears are at least not increasing, contemplating the loss of additional bears related to the mine is not rational.

The final nail in the coffin of FWS's entitlement to deference is its handling of the mortality rate and the Harris thesis. In *Carlton v. Babbitt,* 26 F.Supp.2d 102 (D.D.C.1998), the D.C. district court addressed FWS' application of the Harris thesis and a related Harris article to the Selkirk bear population just west of the Cabinet–Yaak area in Idaho and Washington. The D.C. court found FWS's use of the Harris thesis to be arbitrary and capricious because of the thesis' explicit inapplicability to small populations. (In *Carlton,* the FWS conceded that the Harris thesis should be in the record, after Plaintiff moved to supplement. *Carlton,* at 107.)

"As for the reliance on Mr. Harris' article for the use of the four percent[5] mortality figure, it is hard to see how it can be justified. Mr. Harris' work was based on a population of 448 grizzly bears, over ten times the size of the Selkirk population ... In the very article on which the FWS relied for its assertion, Mr. Harris explicitly stated

that "the concept of sustainable yield is not independent of the size of the population in question...." The FWS unsuccessfully tries to parse Mr. Harris' words to avoid the explicit limitations of his work. It argues that Mr. Harris' article merely acknowledges that sustainable yield is "not independent" of the size of the population and does not state that its use is inappropriate. This attempt to make a semantic distinction is contrary to Mr. Harris' statement in his master's thesis-the document supporting the use of the four percent figure in the management plan-that his research could not be applied to smaller populations ... The FWS therefore was fully aware of the limitations on the use of the Harris figure with a population of 26 to 36 bears, making its use arbitrary and capricious." *Carlton v. Babbitt,* at 109–10.

The D.C. district court held it was arbitrary to rely on Harris' analysis when he explicitly limits its accuracy to larger populations. FWS has attempted to avoid this little legal inconvenience by relying on Harris' later article, based on his thesis, and excluding the thesis from the record. However, the population model used in this appendix supports an annual harvest of 20–24 animals. The total CYE population is estimated at 30–40 bears. BiOp, A–24; AR 24802. Even without considering Harris 1984's more expansive comments about the limited utility of the model on small populations, and adopting only his meager 1986 statements regarding population, to adopt his harvest percentages for a population which could sustain a harvest almost as large as the entire CYE population is arbitrary, or "so implausible that it could not be ascribed to a difference in

---

**5.** In this BiOp, FWS accepted a potential mortality rate of 3.23 to 4.3%, on a population estimate of 30 to 40 bears. AR 25113.

view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Further, Harris stated a population could sustain a 6.35% mortality rate without decline, but if the species is already in decline with the current rate of 2.85–3.8% mortality, Harris' conclusions appear inapt to this population. AR 25113. Going back to the principle that Congress has expressed a preference for the species in a context of uncertainty, FWS' reliance on Harris' formula is arbitrary.

On the second part of this claim, whether mitigation will sufficiently remedy the habitat problem, it appears FWS itself is not even sure what the effects of displacement will be. FWS concludes the mine is likely to displace one or two bears, and maybe impair feeding and breeding, but "there is no scientific or commercial information available that quantifies the effects of disturbance or displacement on the reproductive potential of grizzly bears." AR 25110 (A–109). Two bears could be, by FWS' analysis, two of three to five females in the Cabinets, i.e., forty to sixty percent of females. Concluding that displacing such a high percentage of female bears without greater evidence of no adverse effect is arbitrary.

FWS's determination that the proposed Rock Creek mine will not jeopardize the Cabinet–Yaak grizzly bear population is arbitrary and capricious, in violation of 16 U.S.C. § 1536(a)(2) and 5 U.S.C. §§ 701–706. The Court grants summary judgment to Plaintiffs on Claim I.

### b. Claim II: Mitigation property for bears

■■■ This claim alleges a violation of § 1536(d), which prohibits "any irreversible commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable or prudent mea-sures." FWS relies on the fact that the land must be purchased prior to construction and operation of the mine, 54% before construction and 77% before operation. FWS Resp. Br., 8. FWS claims any violation of Revett's obligation to purchase mitigation land would result in re-initiation of consultation and the loss of incidental take protection.

FWS is right that this section does not apply to FWS at all. Though FWS might decide something that encourages the Forest Service to go ahead, and though that may result in take, FWS fulfills its responsibility under this section by developing an RPM that would work, if properly implemented. Whether or not the mitigation is effective is part of Claim I. On this Claim, FWS is entitled to summary judgment.

In any case, FWS is right that *Southwest Center* controls-it is permissible that the mitigation lands are not yet bought and even that there might be some difficulty. "The Secretary was not even required to pick the best alternative or the one that would most effectively protect the Flycatcher from jeopardy.... The agency's decision need not be ideal ....so long as the agency gave at least minimal consideration to the relevant facts contained in the record. The Secretary need only have adopted a final RPA which complied with the jeopardy standard and which could be implemented by the agency." *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 523 (9th Cir.1998) (internal citation and quotations omitted).

The parties (and the bears) are not yet in the situation raised by *Sierra Club v. Marsh.* However, upon failure to acquire the lands in a timely fashion, Revett and the Forest Service might find themselves in the Corps of Engineers' position in that case—on the verge of violating ESA by unauthorized take without having accom-

plished the mitigation measures. But this is the risk Revett takes, especially by not accumulating the property early in the game. "[T]he risk that the [agency] may not prevail [to acquire mitigation lands] must be borne by the project, not by the endangered species." *Sierra Club,* 816 F.2d 1376, 1386.

On this claim, the Court grants summary judgment to FWS.

### c. *Claim III: Bull Trout*

 FWS is right that previous BiOps are not legally binding, so the simple fact of contradictory conclusions is not, without more, damning. However, a change in conclusion must be explained. *Bush–Quayle,* at 453–54; *Louisiana Public Service Commission v. Federal Energy Regulatory Commission,* 184 F.3d 892, 897 (D.C.Cir.1999).

FWS argues that none of those previous BiOps say *this* subpopulation is crucial, just that all subpopulations are important. FWS takes the position that the Rock Creek bull trout population is relatively insignificant, so even if in the worst case scenario it was extirpated, that would pose no real threat to the DPS. FWS' Resp. Br., 16–17. However, as Plaintiffs point out, individuals of these populations can make it downstream past the Cabinet Gorge dam, just not back upstream. Therefore, they can contribute genetic material to the populations downstream, and therefore, FWS' previous stress on the need to maintain genetic diversity applies. AR 21940; 21761.

Further, FWS appears not to have thoroughly considered the state of the bull trout throughout the DPS. The ESA's regulations allow FWS to limit its analysis of the "effects of the action" and "cumulative effects" to the "action area" for the project being examined (50 C.F.R. § 402.02), but FWS' evaluation of the "current status of the species" and its ultimate jeopardy determination is not limited in geographic scope. 50 C.F.R. § 402.14(g)(2)-(4). FWS must examine the "current status of the species" across its entire range along with the effects of the action in the action area in order to make a jeopardy determination. Pl.'s Reply, 14. Such an examination yields the conclusion that the current status of the species is marginal. A.R. 25141 ("Few bull trout subpopulations are considered strong in terms of relative abundance and subpopulation stability"); A.R. 19671, column 3. Determining the current status of the DPS requires an examination of relevant information generated in the six years since the listing, and FWS fails to update the information. In its defense, FWS quotes an internal email that defined the geographic scope the BiOp should consider. AR 23856; FWS' Resp. Br., 19. FWS claims that the email is evidence that "the Service fully examined the status of the bull trout in Rock Creek, the Cabinet Gorge subpopulation, and indeed in *the entire DPS.*" FWS' Resp. Br., 16–17. (Emphasis in original.) The email directive hardly proves that much. FWS fails to consider the status of the species throughout the DPS and fails to explain satisfactorily why so many projects, all stating the hazard of the loss of subpopulations, have been approved despite the very risk of lost subpopulations. FWS's underlying conclusion may be justifiable, unlike with the bears. However, FWS has failed its procedural obligation here to consider cumulative effects. Summary judgment will be granted to Plaintiffs on Claim III.

(As a side note, FWS's response brief raises eyebrows for a very disturbing ellipses. In the administrative record, page B–50, (AR 25155), FWS identifies strong populations of bull trout. One of these is in the Rock Creek east of Missoula, in the Upper Clark Fork, as opposed to the Rock Creek at issue here. In order to make that distinction, the BiOp says "... strong in Rock Creek, of the upper Clark Fork

River, (not the stream in this project's action area.)." In FWS's brief, they elide the "of", so the sentence reads "strong in Rock Creek, [ ] the upper Clark Fork . . . .," as though those were two different streams. AR 24951. I can't believe this is intentional deception, but rather maybe a misunderstanding of the BiOp (and Montana's geography) itself, although if that were the case, the author should have written "[sic]" instead of eliding the word.)

For the foregoing reasons, it is HEREBY ORDERED:

1. Defendant's Motion to Strike (**dkt # 87**) is granted in part and denied in part. The motion is DENIED as to all documents EXCEPT the Frissell Declaration, which shall be STRICKEN;

2. Plaintiffs' motion to submit new evidence (**dkt # 103**) is DENIED;

3. Plaintiffs' Motion for Summary Judgment is GRANTED as to Claims I and III and DENIED as to Claim II. Defendant's and Intervenor's Motions for Summary Judgment (**dkt ## 67 & 76**) are GRANTED as to Claim II and DENIED as to Claims I and III;

4. The 2003 Biological Opinion is set aside and remanded to the Fish and Wildlife Service for consideration in accordance with this Order. FWS is enjoined from authorizing any take of grizzly bears and bull trout pending compliance with the Endangered Species Act and this Order.