CABINET RESOURCE GROUP, Great Bear Foundation, Idaho Conservation League, Natural Resources Defense Council, and Selkirk Conservation Alliance, Plaintiffs,

v.

UNITED STATES FISH AND WILD-LIFE SERVICE and United States Forest Service, Defendants.

No. CV 04–236–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

Dec. 13, 2006.

Douglas Honnold, Timothy Preso, Abigail Dillen (Bozeman, MT), for the Plaintiffs.

Andrew Smith, U.S. Dept. of Justice (Albuquerque, NM), for the Defendants.

## ORDER

### I. Introduction

Cabinet Resource Group, et al., ("Plaintiffs") bring this action seeking judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, of agency actions by the United States Forest Service and the United States Fish & Wildlife Service concerning road management decisions in the Cabinet–Yaak and Selkirk Grizzly Bear Ecosystems in northwest Montana, northern Idaho and northeast Washington. The First Amended Complaint alleges that the agencies acted in violation of the Endangered Species Act ("ESA"), 16 U.S.C. § 1533 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.

There are cross-motions for summary judgment on all claims. Some of the issues raised here were addressed in this Court's recent ruling in *Alliance for the Wild Rockies v. U.S. Fish & Wildlife Service and U.S. Forest Service*, CV 04–216–M–DWM, issued August 29, 2006. In the *Alliance* opinion, the Court granted summary judgment in favor of the Federal Defendants on all claims. The part of that opinion that is relevant to this case is the Court's consideration the ESA and NEPA claims. The claims were pled in Counts I, V, and VII of the *Alliance* Complaint. These *Alliance* claims generally cover the same ecosystems, planning documents and issues raised here but the Plaintiffs in this case raise arguments that were not advanced by the *Alliance* plaintiffs. The Cabinet Resource Plaintiffs also try to identify factual errors in the *Alliance* opinion and ask the Court to revisit certain factual findings made in the opinion.

In light of the *Alliance* ruling, I ordered the parties to re-submit their summary judgment briefing, tailoring their arguments to the new post-*Alliance* legal landscape. Not surprisingly, the Federal Defendants contend that the reasoning employed in *Alliance* disposes of the claims in this case while the Plaintiffs urge the Court to set aside the documents it upheld against similar challenges in *Alliance* on the basis of arguments not raised in the *Alliance* briefing.

Despite the overlap between the claims in *Alliance* and the claims at issue here, I have given fresh consideration to all issues and arguments presented in this case. Nonetheless, to provide context, and in order to highlight both points of commonality and distinctions between the two cases, the relevant excerpt of the *Alliance* analysis is reproduced at the outset of each section of the discussion of the claims in this opinion.

### II. Factual Background

#### A. Grizzly Bear Management in the Cabinet–Yaak and Selkirk Ecosystems

The grizzly bear was listed as a threatened species under the ESA in 1975. 40 Fed.Reg. 31736. Pursuant to the ESA, the Fish & Wildlife Service approved a Grizzly Bear Recovery Plan in 1982 and revised the Plan in 1993. FWS AR 398 at 4468.[1] The Recovery Plan as revised establishes four recovery zones, including the Cabinet–Yaak Ecosystem and Selkirk Ecosystem Zones. *Id.* at 4825.[2] The Selkirk and Cabinet–Yaak Zones are located

---

1. Citations to the Fish & Wildlife Service administrative record are presented in the following format: FWS AR (document number) at (page number).

2. The other two recovery zones are the Yellowstone Ecosystem Zone and the Northern Continental Divide Ecosystem Zone. At the time of the revisions to the Recovery Plan, the North Cascades and Bitterroot Ecosystems were undergoing evaluation and had yet to be delineated as recovery zones. FWS AR 398 at 4825.

in northwestern Montana, northern Idaho, northeastern Washington, and British Columbia, Canada, and contain 4,560 square miles of habitat on portions of the Kootenai, Lolo, Idaho Panhandle, and Colville National Forests and the Kootenay Lakes Forest District in British Columbia. FS AR 19–9 at S–1.[3] The Cabinet–Yaak and Selkirk Ecosystems are divided into bear management units, each of which approximates the size of a female grizzly's home range and should include representations of all available habitat components. *Id.* at 2–3.

## 1. The Selkirk Ecosystem Recovery Zone

The Selkirk Ecosystem Recovery Zone is located in northeastern Washington, northern Idaho and southern British Columbia. FWS AR 1 at 32. Only fifty-three percent of the land comprising the Selkirk Ecosystem is located in the United States. *Id.* Of that amount, eighty (80) percent is federally owned, meaning forty-two (42) percent of the Selkirk Recovery Zone is subject to the management decisions at issue here. *Id.* These federal lands are administered by the Colville and Idaho Panhandle National Forests and contain ten bear management units. *Id.* at 32–33. One of the units is located almost entirely in the Colville National Forest and is administered by that Forest. Two units straddle the Colville and Idaho Panhandle Forests and are administered jointly. Six units are located solely in the Idaho Panhandle National Forest and one unit is located on Idaho state land and is not subject to federal control. *Id.*

The Selkirk population is estimated at forty-six (46) bears, well below the Recovery Plan's goal of ninety (90) bears. FWS

AR 1 at 33, 35. In 1999, the Fish & Wildlife Service determined that the status of the grizzly in the Selkirk warrants reclassification of the bear from threatened to endangered. *Id.* at 32. The agency has yet to take action on this determination, however, claiming the reclassification is "precluded by work on higher priority species." *Id.* The Fish & Wildlife Service believes the Selkirk population is slightly increasing, but concedes that recent population trend analysis is inconclusive. *Id.* at 12, 36. Population modeling in 1999 indicated that "one additional subadult female mortality in the sampled [Selkirk Recovery Zone] population could push the trend into a decline." *Id.* at 12.

There were six grizzly bear mortalities in the Selkirk in 2002, one of which was an adult female. *Id.* The small size of the Selkirk population has led the Fish & Wildlife Service to establish a mortality goal of zero known human-caused grizzly bear deaths. *Id.* at 34. Despite acknowledging that the Selkirk Recovery Zone is meeting none of its Recovery Plan goals relative to reproduction, distribution and mortality and that there is a clear need to improve protection of grizzlies and their habitat in the Selkirk Ecosystem, the Fish & Wildlife Service speculates, based on the perceptions of researchers familiar with the Selkirk, that the Selkirk population has experienced modest growth in recent years. *Id.* at 46.

## 2. The Cabinet–Yaak Ecosystem Recovery Zone

The Cabinet–Yaak Recovery Zone is located in northwest Montana and northeast Idaho and spans the Idaho Panhandle, Kootenai and Lolo National Forests. FWS AR 1 at 47. Land ownership within

---

**3.** Citations to Discs 1 though 4 of the the Forest Service administrative record are presented in the following format: FS AR (volume number)—(document number) at (page number). Citations to Disc 5 are presented in the following format: FS AR CD 5—(document number) at (page number).

the Cabinet–Yaak Recovery Zone is ninety (90) percent Federal, with the remaining ten percent divided between state and private ownership. *Id.* This zone is made up of two distinct portions, the Yaak portion in the south and the Cabinet Mountains portion in the north, which are connected by two narrow corridors of habitat. *Id.* The Cabinet–Yaak consists of twenty-two (22) bear management units. Fifteen (15) are managed by the Kootenai National Forest, four (4) are managed by the Idaho Panhandle National Forest, one (1) is managed by the Lolo National Forest, and two (2) are jointly administered by the Kootenai and Idaho Panhandle Forests. *Id.*

The Cabinet–Yaak population is smaller than the Selkirk population, estimated at thirty (30) to forty (40) bears. FWS AR 1 at 11. The Recovery Plan goal for the Cabinet–Yaak is one hundred (100) bears. *Id.* at 47. The Cabinet–Yaak Recovery Zone also fails to meet Recovery Plan criteria for reproduction, distribution and mortality. *Id.* at 12. The Fish & Wildlife Service determined that the Cabinet–Yaak grizzly population was low enough to warrant reclassification from threatened to endangered in 1993 and reaffirmed its finding in 1999. Again, no action has been taken on these findings due to work on "higher priority" species. *Id.* at 46. Although the Fish & Wildlife Service characterizes population trend statistics as inconclusive, that conclusion is at odds with record as there appears to be a reasonable

likelihood that the population is decreasing due to heavy grizzly bear mortalities in 1999 and 2000. *Id.* at 11–12, 50.[4] The most recent population trend analysis demonstrates a seventy-five (75) percent likelihood that the population is in decline. FS AR CD 5–12a at 71.

## B. The Wakkinen Study

In 1997, Idaho Fish and Game Department Biologist Wayne Wakkinen and Fish & Wildlife Service biologist Wayne Kasworm published a study using research data from radio-collared grizzly bears in the Selkirk and Cabinet–Yaak Ecosystems to determine open and total road density and core habitat levels necessary to support the grizzly bear population (the "Wakkinen study"). FWS AR 413. The Wakkinen study is based on data derived from observation of six female grizzlies in their home ranges, each of which produced young during or prior to the five-year study period from 1989 to 1994. *Id.* at 23; FS AR 19–9 at 4–29. From this information the authors drew an inference to support their conclusion that on average a female grizzly's home range in the Cabinet–Yaak and Selkirk Ecosystems has open motorized road density exceeding one mile per square mile on thirty-three (33) percent of the area, total motorized road density exceeding two miles per square mile on twenty-six (26) percent of the area, and core habitat in fifty-five (55) percent of the area. FWS AR 413 at 1.[5,6]

---

4. There were five (5) known grizzly bear mortalities in 1999 and four (4) in 2000. FWS AR 1 at 11. Two (2) human-caused female grizzly bear deaths were documented in 2001. *Id.* at 63. These deaths prompted the Fish & Wildlife Service to state that "[e]ven though the trend estimates are inconclusive, due primarily to high levels of grizzly bear mortalities, the Service is concerned about the status of this population." *Id.* at 50.

5. Grizzly bear habitat parameters based on percentages of open motorized road density,

total motorized road density and core habitat are referred to hereafter in the following format: (open motorized road density)/(total motorized road density)/(core habitat). The Wakkinen standard for habitat parameters, for example, is 33/26/55.

6. A 1993 study of ten grizzlies in the South Fork area of the Flathead National Forest, located in the Northern Continental Divide Ecosystem Recovery Zone, yielded open road, total road and core values of 19/19/68, which are significantly more protective of grizzly

The Wakkinen study found that about ninety (90) percent of the habitat use by bears in the Cabinet–Yaak and Selkirk Recovery Zones occurred in core areas measuring ten (10) square miles or greater and ninety-five (95) percent of habitat use occurred in areas of four (4) square miles or greater. FWS AR 413 at 22; FWS AR 331 at 3200. While the study's authors found that small sample sizes prevented them from identifying a useful minimum core habitat patch size, they noted that "larger blocks of core are likely beneficial to bears" and "if a minimum core size occurs, it is likely between [two (2) square miles and eight (8) square miles]." FWS AR 413 at 25–26.

## C. The 2001 Colville Biological Opinion

In 2001, ESA consultation between the Forest Service and Fish & Wildlife Service culminated in the issuance of a Biological Opinion on the continued implementation of the Colville National Forest Plan (the "2001 Biological Opinion").[7] FWS AR 417. The 2001 Biological Opinion did not assess the impact on listed species of any new action, but rather sought to re-assess, in light of intervening events and new information, the impact on grizzly bears of the continued implementation of the Coville National Forest Plan, including motorized access management decisions. Id. at 1, 6.

The Fish & Wildlife Service concluded in the 2001 Biological Opinion that "the [Colville] Forest Plan, as currently implemented, is not likely to jeopardize the continued existence of the grizzly bear within the Selkirk Ecosystem." FWS AR 417 at 41. In reaching its conclusion the Fish &

Wildlife Service noted that two of the three Colville bear management units already met the Wakkinen 33/26/55 standard, and federal management was unlikely to bring the third into compliance with the standard because it is comprised of less than seventy-five (75) percent federal land. Id. at 36.

The "no jeopardy" finding was accompanied by an incidental take statement indicating that take of grizzlies will occur in any bear management unit failing to meet any part of the 33/26/55 standard.[8] Id. at 43. The Opinion included reasonable and prudent measures to limit the impacts of take and terms and conditions for implementation of those measures that the Forest Service is required to follow to be exempt from Section 9 of the ESA. Id. at 46. The terms and conditions require the Forest to maintain minimum core area of fifty-five (55) percent in bear management units containing at least seventy-five (75) percent federal land and, if a seasonal core approach is deemed inappropriate for the area, the Forest must not exceed the Wakkinen road densities of thirty-three (33) open and twenty-six (26) total in the same units. Id. at 46–48. The relevant bear management units already met the 33/26/55 standard, meaning the terms and conditions required the Colville Forest only to maintain the status quo. Id. The 2001 Biological Opinion does not establish a minimum patch size for core habitat.

## D. The 2004 Kootenai/Lolo/Idaho Panhandle Forest Plan Amendments

In response to a directive from the Interagency Grizzly Bear Committee, the

---

habitat than the 33/26/55 values found in the Wakkinen Study: FWS AR 380.

7. The Colville National Forest contains the Salmo–Priest, Sullivan–Hughes, and LeClerc Bear Management Units. FS AR 19–9 at 2–5.

8. Section 9 of the ESA prohibits the "taking" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). To "take" under the statute is to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

Selkirk/Cabinet–Yaak Subcommittee in 1998 issued interim rules to govern motorized access in the Selkirk and Cabinet–Yaak Recovery Zones. The interim rules were designed to remain in effect for three years or until the applicable Forest Plans were revised. FWS AR 1 at 2. The following year, the Alliance for the Wild Rockies sued the Kootenai and Idaho Panhandle National Forests for implementing the interim access rules without amending their Forest Plans. *Id.* The Forests settled the lawsuit in 2001 by agreeing to amend their Forest Plans to address grizzly bear habitat management. *Id.* The Lolo National Forest, though not named in the lawsuit, asked to be included in the planning process so it could make conforming amendments to its own Forest Plan to provide consistent management direction throughout the Cabinet–Yaak Recovery Zone. *Id.*

The Forests initiated a planning process with a purpose to "[a]mend Forest Plans to include a set of motorized access and security guidelines to meet our responsibilities under the Endangered Species Act to conserve and contribute to recovery of grizzly bears." FS AR 19–9 at S–1. In March of 2002 the Forest Service issued a Final Environmental Impact Statement analyzing the potential impacts of various alternatives and identifying Alternative E as the preferred alternative. FS AR 19–9 at 2–15.[9]

Alternative E prescribed individual habitat security standards for each bear management unit. *Id.* In any bear management unit not meeting the standard set for that unit, future actions effecting habitat parameters would have to result in movement toward compliance with the standard. *Id.* However, in any unit exceeding the standard set for that unit, Alternative E allowed for decreases in habitat parameters to facilitate management flexibility, provided the decreases would not bring the unit below the standard with respect to any of the habitat parameters. *Id.*[10]

The Forest Service requested formal ESA consultation with the Fish & Wildlife Service on Alternative E on June 27, 2002. On February 9, 2004, the Fish & Wildlife Service issued a Biological Opinion on the proposed amendments to the Kootenai, Idaho Panhandle and Lolo Forest Plans finding that the implementation of the proposed amendments is not likely to jeopardize the continued existence of the grizzly bear within the Cabinet–Yaak and Selkirk Ecosystem Recovery Zones (the "2004 Biological Opinion"). FWS AR 1 at 125. The Service based its view on "the fact that overall grizzly core habitat within these

9. The alternatives considered in detail were Alternatives A (no action), B (continued adherence to the Subcommittee's interim rules), C (33/26/55 standard for every unit made up of at least seventy-five [75] percent federal land) and the preferred Alternative E. FS AR 19–9 at 2–6 to 2–17. Three alternatives not given detailed study were Alternatives D (increased security habitat achieved by implementing a 17/14/72 standard for all units comprised of at least seventy-five [75] percent federal land), F (maintenance of current access levels) G (maximum access). *Id.* at 2–18.

10. The management flexibility gained by allowing decreases in habitat parameters in overperforming bear management units was de-

signed to allow the Forests to address "issues related to public and administrative access, economics, access to private inholdings, and increased grizzly bear habitat security." FS AR 19–9 at 2–15. It is not clear how this "management flexibility" would lead to increased grizzly bear habitat security in light of the Forest Service's statement that "[a]n important design feature providing management flexibility in Alternative E allows increases in route densities in core habitat within individual [bear management units] that exceed the standards for these parameters." *Id.* While increases in road densities and invasion of core habitat may facilitate logging, public access and access to private inholdings, such increases do not appear to offer any benefit to the grizzlies or their habitat.

Recovery Zones will increase, and will be provided at quantities sufficient to support the average female grizzly bear's home range needs, as indicated by research in these Recovery Zones." *Id.* The research upon which the Fish & Wildlife Service relied is the Wakkinen study and its 33/26/55 habitat parameters. *Id.* at 40–42; 125. The Service found that "habitat improvements resulting in increased grizzly bear numbers and distribution that will be gained within the Recovery Zones through implementation of the proposed Amendment are sufficient to preclude jeopardy to the [Selkirk] and [Cabinet–Yaak] grizzly bear populations." *Id.* at 126–127.

The view expressed was not pristine; the Fish & Wildlife Service also included an incidental take statement observing that some take of grizzly bears is expected to occur within bear management units that continue to fail to meet the Wakkinen 33/26/55 standard, though the amount of expected take could not be precisely quantified. FWS AR 1 at 130. The Service also anticipated the take of up to one grizzly bear due to sanitation issues. *Id.* at 131.

The incidental take statement is accompanied by mandatory terms and conditions governing the implementation of reasonable and prudent measures designed to minimize the impacts of incidental take of grizzly bears. *Id.* at 134–140. Among other things, the terms and conditions require the following:

— All bear management units must be brought into compliance with their respective habitat parameters standards by December 31, 2013.[11] *Id.* at 135.

— Newly created core habitat must not be entered for at least ten years after its creation, and core habitat within each bear management unit must not be disturbed more frequently than once every ten years. *Id.* at 136.

— No permanent net loss of core habitat may occur within any bear management unit currently exceeding its habitat standards, and temporary reductions in habitat must be limited to no more than three of every ten years and may not result in core habitat levels below the standard set for that bear management unit. *Id.* at 137.

— The habitat parameter standards for Bear Management Units 3, 5, 10 and 13, and the Blue–Grass Bear Management Unit must be more protective of grizzly habitat than the standards proposed for Alternative E in the Final Environmental Impact Statement. *Id.* at 135–136; FS AR 19–11 at 3, 9.

— The Forests must submit annual reports to the Fish & Wildlife Service setting forth the progress made toward the achievement of the standards set for bear management units within the Recovery Zones. *Id.* at 138.

The 2004 Biological Opinion does not establish a minimum core patch size.

In March of 2004 the Forest Service issued a Record of Decision adopting Alternative E as modified by the incorporation of the terms and conditions imposed by the 2004 Biological Opinion. FS AR 19–11 at 3. The amendments implemented

**11.** Most of the habitat parameter standards set for the thirty (30) bear management units covered by the amendments are at or near the 33/26/55 Wakkinen standard. The most secure standard is 15/15/80 for Bear Management Unit 1 in the Kootenai National Forest, while the least secure is 82/56/20 for the Lakeshore Bear Management Unit in the Idaho Panhandle National Forest. FWS AR 1 at 135–136.

as a result of the Record of Decision are programmatic; they do not authorize any site-specific projects or involve site-specific access management decisions. *Id.* at 1. Modification of any individual roads or trails or their use will be subject to project-specific planning and analysis. *Id.*

Once fully implemented, the amendments will increase the number of bear management units meeting or exceeding the Wakkinen study core habitat standard of fifty-five (55) percent from fourteen (14) to twenty (20) (of twenty-two (22) total) in the Cabinet–Yaak and from five (5) to seven (7) (of eight [8] total) in the Selkirk.[12] FWS AR 1 at 7. Compliance with the Wakkinen study's total motorized access density limit of twenty-six (26) percent will increase from eleven (11) to sixteen (16) units in the Cabinet–Yaak and from five (5) to seven (7) units in the Selkirk. *Id.* With regard to open motorized access density, the Forests' adherence to the Wakkinen study's limit of thirty-three (33) percent will remain steady at fifteen (15) units in the Cabinet–Yaak and seven (7) units in the Selkirk. *Id.* Twenty (20) of the thirty (30) bear management units affected by the amendments will meet or exceed the 33/26/55 standard, while eight (8) currently do. *Id.;* FS AR 19–11 at 23. Overall core habitat will increase from fifty-six (56) percent to fifty-eight (58) percent in the Cabinet–Yaak and will remain steady at sixty-four (64) percent in the Selkirk. FWS AR 1 at 103–104. The amendments do not establish a minimum core patch size.

## E. The Plaintiffs' Claims

The Amended Complaint alleges three claims for relief. Under Count I, Plaintiffs assert that the Fish & Wildlife Service's 2001 Biological Opinion on continued implementation of the Colville National Forest Plan violated the ESA because it relied on inadequate scientific information in the form of the Wakkinen study. The Plaintiffs also allege that the agency failed to consider other available scientific information concerning the status of the Selkirk Recovery Zone grizzly population and the requirements for the grizzlies' survival and recovery. For these reasons, Plaintiffs contend that the "no jeopardy" finding in the 2001 Biological Opinion is not supported by the best available science and is arbitrary, capricious, an abuse of discretion and not in accordance with the ESA.

Count II is an ESA challenge to the 2004 Biological Opinion on motorized access amendments to the Kootenai, Lolo, and Idaho Panhandle Forest Plans. Plaintiffs again assail the Fish & Wildlife Service's reliance on the Wakkinen study and accuse the agency of ignoring other available information about the habitat needs of the Cabinet–Yaak and Selkirk grizzly bear populations. Plaintiffs contend that the "no jeopardy" finding in the 2004 Biological Opinion is not supported by the best available science and is arbitrary, capricious, an abuse of discretion and not in accordance with the ESA.

Count III is a NEPA claim alleging that the Forest Service, in issuing its March 2002 Final Environmental Impact Statement and March 2004 Record of Decision on the motorized access amendments to the Kootenai, Lolo, and Idaho Panhandle Forest Plans, arbitrarily failed to rigorously explore all alternatives to the proposed action and failed to adequately address the deficiencies in the Wakkinen study. Plaintiffs also contend that the Forest Service shirked its duty to prepare a supplemental environmental analysis in light of new in-

---

**12.** Only eight (8) of the Selkirk Recovery Zone's bear management units are subject to these amendments. FS AR 19–11 at 22.

formation (learned after the issuance of the Record of Decision) regarding grizzly bear deaths in the Cabinet–Yaak Ecosystem.

The parties have filed cross-motions for summary judgment on all claims. While the Government has the upper hand on the first two claims, in my view the Plaintiffs prevail on their NEPA claim. My reasoning is set forth below.

## III. Analysis

### A. Standard of Review Applicable to All Claims

#### 1. Standard of APA Review

■■■■ Agency decisions can only be set aside under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A), overruled on other grounds by *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). Agency action can be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Alvarado Community Hospital v. Shalala,* 155 F.3d 1115, 1122 (9th Cir.1998). The court must ask "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment … [The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made.

[The] review must not rubber-stamp … administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engineers,* 361 F.3d 1108, 1119 (9th Cir.2004) (internal citations and quotations omitted).

#### 2. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *see also, Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is particularly applicable to cases involving judicial review of final agency action. *Occidental Engineering Co. v. INS,* 753 F.2d 766, 770 (9th Cir. 1985) (citation omitted). Summary judgment is appropriate in this case because the issues presented address the legality of the Federal Defendants' actions based on the administrative record and do not require resolution of factual disputes.

### B. ESA Claims (Counts I and II)

#### 1. Legal Standard

■■■ Section 7(a)(2) of the Endangered Species Act requires federal agencies to consult with the Fish & Wildlife Service or the National Marine Fisheries Services [13] to ensure that any action authorized, funded or carried out by the agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in destruction or adverse modification of critical habitat for such species. 16 U.S.C. § 1536(a)(2). Agencies involved in this process must use the best scientific and commercial data available. *Id.* The statute and its implementing regu-

---

**13.** The ESA consulting agency at issue in this case is the Fish & Wildlife Service.

lations establish a framework for assessing the impacts of a proposed activity on listed species. 16 U.S.C. § 1536; 50 C.F.R. Part 402.

An agency proposing an action must first determine whether the action "may affect" species listed as endangered or threatened under the ESA. 50 C.F.R. § 402.14(a). If the agency determines that the proposed action may affect listed species, formal consultation with the Fish & Wildlife Service is required except in certain instances. *Id.*

Formal consultation requires the Fish & Wildlife Service to prepare a biological opinion in which the Service advises a federal agency as to whether the proposed action, either alone or cumulatively with other actions, is likely to jeopardize the continued existence of any listed species or is likely to result in the destruction or adverse modification of any critical habitat. 50 C.F.R. § 402.14(h)(3). If the Fish & Wildlife Service determines that a proposed action is likely to result in jeopardy or loss of critical habitat, the Service must set forth reasonable and prudent alternatives to the action, if any. 16 U.S.C. § 1536(b)(3)(A). If the Service determines that a proposed action will result in incidental take of listed species but that the action and associated incidental take will not violate the ESA Section 7 jeopardy standard, the Service must attach an incidental take statement to the biological opinion. 16 U.S.C. § 1536(b)(4); 50 C.F.R. 402.14(i)(1). The incidental take statement sets forth the predicted impact to listed species, the reasonable and prudent measures that are necessary to mini-

mize take, and the terms and conditions for the implementation of those measures. *Id.* If the action agency complies with the terms and conditions of the incidental take statement, the expected take is exempted from the take prohibition set forth in ESA Section 9 (16 U.S.C. § 1538(a)(1)(b)). 16 U.S.C. § 1536(*o*)(2).

### 2. Relevant Excerpt of the *Alliance* Opinion

The Plaintiffs in the *Alliance* case raised an ESA challenge to the 2004 Biological Opinion similar to the one alleged in Count II here.[14] The relevant excerpt of the *Alliance* opinion states:

Counsel for the Government put his finger on the crux of this dispute at oral argument, when he pointed out that Plaintiffs appear to be demanding that Fish and Wildlife and the Forest Service in particular actually save the grizzly bear from extinction, rather than, as ESA § 7(a)(2) requires, ensure that the actions taken by the Forest Service do not "jeopardize the continued existence" of the grizzlies.

Plaintiffs have reason to be concerned about the fate of the grizzlies in the Cabinet–Yaak and Selkirk Ecosystems. The populations are paltry and would qualify as endangered but for FWS's policy about priority. However, a § 7(a)(2) consultation is not a mechanism by which all harms to the grizzlies can be erased. The question here is narrow: Do the Forest Service amendments jeopardize grizzlies? Plaintiffs maintain that the status quo is unac-

14. The parties do not differentiate between the 2001 Biological Opinion (Count I) and the 2004 Biological Opinion (Count II) in their briefing and arguments, but rather focus on the Plaintiffs' allegations regarding the deficiencies in the Wakkinen study and the Fish & Wildlife Service's alleged failure in both instances to consider other available scientific information. Accordingly, the discussion of these two claims is combined into a single ESA analysis, and the Court's reasoning in the *Alliance* opinion regarding the 2004 Biological Opinion is relevant to both the 2001 and 2004 Biological Opinions at issue in this case.

ceptable and the amendments only barely improve on the status quo. Thus, according to Plaintiffs, the amendments jeopardize grizzlies by failing to sufficiently improve on the status quo. Conversely, Defendants maintain that because the chosen alternative would improve upon current conditions, if only slightly, the Amendments do not jeopardize the bears.

In *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515 (9th Cir.1998), the Ninth Circuit discussed the Secretary's decision to adopt a biological opinion, reasonable and prudent alternative, and incidental take statement. Plaintiffs in that case alleged various violations of the ESA. The Court wrote:

> [U]nder the ESA, the Secretary was not required to pick the first reasonable alternative the FWS came up with in formulating the RPA. The Secretary was not even required to pick the best alternative or the one that would most effectively protect the Flycatcher from jeopardy. The Secretary need only have adopted a final RPA which complied with the jeopardy standard and which could be implemented by the agency.

*Id.* at 523 (internal citation omitted). The Court went on to say:

> The district court correctly held that the only relevant question before it for review was whether the Secretary acted arbitrarily and capriciously or abused his discretion in adopting the final RPA. In answering this question, the court had only to determine if the final RPA met the standards and the requirements of the ESA. The court was not in a position to determine if the draft RPA should have been adopted or if it would have afforded the Flycatcher better protection.

*Id.* This framework is useful in evaluating Plaintiffs' persuasive, but legally unavailing, claims.

### 2. Grizzly Bear Mortality

Plaintiffs' first argument, which is a theme throughout much of their Complaint, is that FWS's various decisions in this matter are not supported by sufficient science. Plaintiffs argue that FWS did not adequately consider grizzly mortality rates and that the BiOp's baseline artificially excludes other simultaneous projects with effects on grizzlies. Plaintiffs cite this Court's opinion in *Rock Creek Alliance v. U.S. Fish and Wildlife Service*, 390 F.Supp.2d 993 (D.Mont.2005), for the idea that improper reliance on poor science takes a decision out of the realm of FWS's discretion and into a violation of the law. Plaintiffs point to the BiOp's opinion that sanitation issues remain problematic in the recovery zones and "up to one bear" is likely to die as a result, yet the Amendments do nothing to improve sanitation. FWS AR 1: 136. Plaintiffs also argue that FWS should have done a *Rock Creek Alliance*-type analysis and estimate the mortality that the population can withstand.

Defendants' view is that their scientific information is credible, and Plaintiffs must defer to the agency's scientific expertise. Specifically on mortality rates, Defendants contend the BiOp sufficiently addresses mortality in the Selkirk and Cabinet–Yaak Ecosystems, citing FWS AR 1:38–43, 53–58, 130, 135, & 139. Defendants characterize these discussions as considering mortality, the mechanisms affecting mortality, and the effects of the proposed action on mortality. That, they argue, is sufficient to meet their ESA burden.

It is important to clarify the distinction between this situation and the situa-

tion this Court considered in the *Rock Creek Alliance* case. In *Rock Creek Alliance,* FWS issued a biological opinion and Incidental Take Statement that allowed a mine to go forward in the Rock Creek area of the Cabinet–Yaak, despite the fact that additional bear mortality was expected due to the mine. 390 F.Supp.2d at 997–98. Unlike the BiOp here, which involved programmatic amendments, the Rock Creek BiOp considered a site-specific project. *Id.* The Court concluded it was arbitrary to allow a project (especially a private mining project) go forward that would result in further deaths in a threatened (and, but for bureaucratic restrictions) population that was quite possibly in decline. *Id.* at 1009.

Unlike in *Rock Creek Alliance,* here the amendments will, however slightly, *improve* the situation for bears in the Cabinet–Yaak and Selkirk Recovery Zones. The only predicted take identified by the FWS relates to sanitation, which, since it was not part of the modification of access management, occurs at the same level or is not expected to increase as a result of the Amendments. In addition, the *Rock Creek Alliance* BiOp relied on the disputed Harris Report, which explicitly stated that its analysis was not applicable to small populations. This Court determined that it was arbitrary and capricious to rely on a predictive model that, by its own plain terms, was not applicable to a population as small as the Cabinet–Yaak. *Id.* In this case, the agencies are not relying on a model like Harris' that predicts population status, but rather a collection of data about a few bears in the very ecosystem at issue in this case. Whether the science is sufficient is a separate question, but as a preliminary matter, the problems with the science in the *Rock Creek Alliance* case are not the

same issues presented here. *Rock Creek Alliance* does not decide this case.

The BiOp is candid about the mortality challenges facing these bears. In the "Status of the Grizzly" section of the BiOp, FWS states that neither population is statistically increasing, though the Selkirk population appears to be in better shape. The BiOp also states the modeling in 1999 suggested that one more subadult death in the Selkirk could "push the trend into a decline." FWS AR 1:17. In the Selkirk Recovery Zone, only one of the four grizzly recovery goals is being met, and the present mortality goal is zero bears due to the small population. FWS AR 1:38–39. The BiOp reports that mortality was unusually high in 2002. FWS AR 1:41–43. The FWS's general conclusion is that, although the numbers are inconclusive and there is a lot of habitat improvement to make, based on the experience and perception of the researchers and field personnel, the situation in the Selkirk is slightly improving for bears. FWS AR 1:51.

The picture in the Cabinet–Yaak Ecosystem is worse. The Cabinet–Yaak population appears to be decreasing, especially due to high mortalities in 1999 and 2000. FWS AR 1:16–17. The population is slightly smaller (estimated 30–40 bears) and "[e]ven though the trend estimates are inconclusive, due primarily to recent high levels of grizzly bear mortalities, the Service is concerned about the status of this population." *Id.* at 55. Mortality has not been as high in the Cabinet–Yaak as in the Selkirk in the last twenty-five years or so. *Id.* at 56.

Plaintiffs contend this statistical information is useless, because telling us how many bears have died does not tell us how many more can die before the population fails to recover and goes extinct. However, the law requires FWS to use

the best scientific and commercial information available. It is clear from the record in this case that there is not an abundance of firm information about how much mortality grizzly bears can withstand. Further, there is no suggestion from the Plaintiffs that the information they want is available. Fish and Wildlife made its decision based on the best scientific information available. In conjunction with FWS's determination that bears will not die as a result of the Plan Amendments, it is not arbitrary and capricious not to calculate the effects of additional (unlikely) mortality. Additionally, under the standard set forth in ESA § 7(a)(2), the question is whether the Plan Amendments will jeopardize the bears. The bears' current situation is bad, but over time their habitat will improve as the BMUs conform to the Amendments. FWS sufficiently considered grizzly bear mortality in its biological opinion.

3. Grizzly Bear Recovery

Plaintiffs contend that the record raises substantial doubt about whether grizzly bears will recover. Plaintiffs state that FWS must specifically find that grizzlies affected by the Plan Amendments still have the potential to recover. Plaintiffs draw this requirement from the ESA's implementing CFRs, which define "jeopardize the continued existence of" as actions that would "reduce appreciably the likelihood of both the survival and recovery of the listed species." 50 C.F.R. § 402.02. Plaintiffs claim that the record "raises substantial doubt as to whether there remains a realistic possibility that grizzly bears in the CYE and SE will eventually recover." Plaintiffs also argue that linkages between habitat areas are crucial for recovery and entirely ignored in the BiOp. Even if there are enough bears,

without linkages, bears still may not recover over time.

The Government points to the increased core areas across the Cabinet–Yaak and Selkirk Recovery Zones, the decreased linear densities outside of the recovery areas, and restrictions on further losses of core habitat, and cites the BiOp's conclusion that "overall core grizzly bear habitat within these Recovery Zones will increase, and will be provided at quantities sufficient to support the average female grizzly bear's home range needs, as indicated by research in these Recovery Zones." FWS AR 1:130. From FWS's perspective, the improved conditions support the conclusion that bears will probably do better under the Amendments. But FWS does express some uncertainty in this conclusion. "[D]isplacement and mortality effects upon grizzly bears resulting from roads and road densities will likewise decrease with the Recovery Zones, which *may result* in increased grizzly bear numbers and distribution within the Recovery Zones." FWS AR 1:131 (emphasis added).

Again, the question is does the agency action "reduce appreciably the likelihood of both the survival and recovery" of the grizzly? 50 C.F.R. § 402.02. The Ninth Circuit has held that the FWS's duty is to assess a project's potential to adversely modify critical habitat's ability to support both survival *and* recovery. *See Gifford Pinchot Task Force v. U.S. Fish and Wildlife*, 378 F.3d 1059, 1069 (9th Cir.2004). However, this Court is unaware of any BiOps that have been held arbitrary and capricious for failing to discuss recovery adequately where the FWS made a finding of no jeopardy. As seen through the lens of ESA § 7(a)(2), the amendments proposed do slightly more for recovery and survival than the status quo. Consequently, the FWS

saatisfied [sic] its legal obligation in concluding that the Amendments do not reduce the likelihood of the survival and recovery of the grizzly.

\* \* \* \* \* \*

5. Best Scientific Data Available

Plaintiffs argue that FWS and the Forest Service failed in their 16 U.S.C. § 1536(a)(2) duties because they did not "use the best scientific and commercial data available." Plaintiffs dispute FWS's and the Forest Service's reliance on the "Wakkinen Report," which is the grizzly habitat study for the Cabinet–Yaak and Selkirk ecosystems relied on by the Government. Plaintiffs question the validity of this study because it is based on only six bears in what they consider "a highly degraded ecosystem." Plaintiffs argue that "the record in this case simply does not support the agencies' finding that the Wakkinen report's road density and core parameters represent the most scientifically defensible standards for management." Even assuming the Report is the best science available, Plaintiffs contend that the Plan Amendment does not meet the Report's standards. Plaintiffs point out that the agencies have established 2400 acres (about 4 square miles) as the minimum core habitat block size, when Wakinnen [sic] found that ninety per cent of habitat use in the CYE occurred in areas of at least 8 sqare [sic] miles. Plaintiffs also dispute the lack of strict road guidelines outside the recovery zones.

Defendants respond by pointing out that Plaintiffs have not identified any information they ignored or that was available and better than the information they used. Defendants emphasize the fact that Wakinnen's [sic] study is the only one specifically dealing with the Cabinet–Yaak and Selkirk Ecosystems and was subject to peer review. FWS AR 277:2826–28; 333:3210–15;

334:3216–18; 332:3206–08; 133:1483; FS AR 26:9 at 5.

The ESA requires that the biological opinion and agency action be based on "the best scientific and commercial information available." 16 U.S.C. § 1536(a)(2). This court "cannot substitute [its] judgment for that of the Forest Service and Fish & Wildlife but instead must uphold the agency decisions so long as the agencies have considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944 (9th Cir.2003) (internal quotation marks and citations omitted). The standard does not require the agency to rely on indisputable or unequivocal evidence. The Court may conclude that "[w]hile another decisionmaker might have reached a contrary result, the agencies conducted a reasonable evaluation of the relevant information and reached a conclusion that, although disputable, was not arbitrary and capricious." *Id.* at 956.

As for the first step of this analysis, FWS's reliance on the Wakkinen Report cannot be assailed. There are problems with the study, and it might have been better to have higher population numbers from which to work. These shortcomings are acknowledged by FWS. FWS AR 277:2826–28; 333:3210–15; 334:3216–18; 332:3206–08. However, FWS's preference for a study in the ecosystem at issue is reasonable and should be left to FWS's discretion. While other studies might consider higher numbers of bears, the record shows that this ecosystem has an unusually high road density. There is a rational and articulated reason in the record for basing the Amendment on research in the area to be managed.

Fish and Wildlife, and the Forest Service, considered other sources of information, including the Mace and Manley study of grizzlies in the South Fork of the Flathead River. FS AR 26:9 at 5; FWS 1:44. Plaintiffs do not show which other information would have been more appropriate, but rather attempt to poke holes in the Government's choices. The Court does not have grounds to conclude FWS's information was not the best information available.

Plaintiffs alternatively contend that if Wakinnen [sic] is the best science available, then Defendants' choice to authorize BMUs with less habitat than Wakinnen [sic] recommends cannot have been based on the best information. However, FWS and the Forest Service both explain why some units do not meet the standards required by Wakinnen [sic]. FWS 1:43, 46–47; FS AR 15–43 at 3–10. The Amendments require no permanent loss of core habitat. FWS AR 1:107–11. This dovetails with the reasons for a programmatic amendment. The BMUs have widely diverse characteristics. While most BMUs are 100 square miles, there are smaller ones, such as the thirty square mile Lakeshore BMU on Priest Lake. FS AR 15–43 at 3–10. There are BMUs that consist of wilderness areas, BMUs that abut towns or highly used recreational areas, and BMUs with highways and railroad tracks. FWS AR 1:61. There are BMUs, such as the two slender ones that connect the Cabinet and Yaak portions of the CYE that might be particularly crucial for genetic and population purposes. FWS AR 1:54. The programmatic amendments set standards for across the forest, but their effects on and implementation in particular BMUs will vary. This was the reason the Forest Service chose to design the amendments the way it did.

Based on review of the administrative record and discussions within it of the shortcomings of the scientific information and the lack of availability of alternate site-specific information, it was not arbitrary and capricious for Defendants to rely on the scientific information included in the record.

*Alliance for the Wild Rockies v. United States Fish and Wildlife Service,* CV 04–216–M–DWM (August 29, 2006) at pp. 7–21 (footnotes omitted; emphasis in original).

### 3. Discussion

The Plaintiffs in this case offer two grounds for their claim that the 2001 and 2004 Biological Opinions violate the ESA. First, they contend that the Wakkinen study is not the best available science and that the Fish & Wildlife Service failed to adequately explain its reliance on the Wakkinen study in light of the fact that two of the six bears monitored in the study were killed by humans shortly after the end of the study period. This argument is similar to the one raised by the *Alliance* plaintiffs, but the Plaintiffs here place greater emphasis on the post-study deaths and other shortcomings in the Wakkinen study. The second argument alleges that the Fish & Wildlife Service violated the ESA by failing to establish a minimum core patch size despite the Wakkinen study's finding that ninety-five (95) percent of core habitat use occurs in patches at least four (4) square miles in area.

### a. Reliance on the Wakkinen study

The Plaintiffs argue that the Wakkinen's study's flaws render it unworthy of the agencies' reliance as a source for grizzly bear habitat management direction. Plaintiffs contend that by relying upon the Wakkinen study the Fish & Wildlife Service has violated the ESA by failing to use the best available scientific data and by

failing to ensure that the Forest Service's actions do not jeopardize the continued existence of the grizzly bear.

The Plaintiffs identify numerous shortcomings in the Wakkinen study. They emphasize that the authors of the Wakkinen study conceded the possibility that the habitat parameters they measured are not optimal for the bears, but merely reflect the bears' selection of the best habitat available, even if it is not ideal. In attempting to explain the discrepancy between the South Fork study's 19/19/68 habitat parameters and their own study's values of 33/26/55, the Wakkinen authors state, "Perhaps bears in the Selkirk and Yaak Study areas had no areas available to them which would allow for larger core areas or significant areas with lower road densities. Without a comparison of a large area (first order selection) we will not be able to answer that question." FWS AR 413 at 24–25. While left unanswered, the question is very important in measuring the study's validity.

The study's conclusions are further undermined, according to the Plaintiffs, by the fact that two of the six bears studied were killed by humans shortly after the evaluation period. FWS AR 413 at 23. Plaintiffs argue that there is no valid basis for the Fish & Wildlife Service's reliance on the Wakkinen study's findings when the habitat situation upon which the study is based proved lethal to one third of the female bears involved. Plaintiffs argue there is even more reason to question the study's findings because a third female bear involved in the study reached full adulthood during the last year of the study. Id. at 23. This is significant because subadult females tend to have larger home ranges than reproductive adults as they explore different habitat options. Id. The Plaintiffs claim the inclusion of this female's habitat use during her subadulthood further corrupts the results of the Wakkinen study, particularly in light of the fact that she used the least core habitat of any bear in the study. Id. at 21.

Some Fish & Wildlife Service biologists expressed reservations about the Wakkinen's study's findings as a result of these shortcomings. Two biologists who commented on a draft of the Wakkinen study in 1996 stated:

We remain concerned that we are studying bears and drawing conclusions from their use in an already degraded environment. Are we developing habitat-use conclusions from grizzly bears that are just barely getting by? Or are the grizzly bears thriving and successfully reproducing in the study areas? You state in the discussion that survival and reproduction success must be considered when selecting animals to use as the basis for standards—we support this and recommend including additional information on this topic. If the grizzly bears are not thriving in the existing environmental baseline, we may need to develop open road densities, total road densities, and core standards that are more conservative than would be indicated by this study.

FWS AR 336 at 3230. In 1998, when Wakkinen's 33/26/55 standard was before the Interagency Grizzly Bear Committee's Cabinet–Yaak/Selkirk Subcommittee as a proposed standard for access management, a biologist in the Fish & Wildlife Service's Spokane office questioned the adequacy of the Wakkinen parameters, stating:

This office has never concurred with the minimum 55% core suggested by the SE/CYE Access Task Group. The best available and most defensible scientific information available on the core security needs of female grizzly bear comes from the combined data sets: SE–CYE, 55% core (n=6) and the NCDE 68% core (n=8), arithmetic mean of 61.5%

core (n=14). Accordingly, we propose a long-term strategy based on 61.5% core with concomitant reductions in open road density and total road density.

FWS AR 316 at 3007.

A Telephone Conversation Record of a conference call among Fish & Wildlife Service biologists on March 22, 2001 suggests that the authors of the 2004 Biological Opinion initially disregarded the Wakkinen study in favor of a more protective standard that they deemed more accurate, but that they were overruled by superiors within the agency. The Telephone Conversation Record states:

> I also reminded Carole that when we first started writing this BO [biological opinion], we suggested managing for criteria that is greater than the "Waynes" numbers because of our concern with data size, better applicable data sets on female home ranges from the [Northern Continental Divide Ecosystem], etc. However, we were told by Helena that any BO requiring standards in excess of the "Waynes" numbers would not be supported, and Chris Servheen in fact, stated that he would go directly to our Regional Director and recommend that she not support such a BO.

FWS 289 at 2870.[15]

The Plaintiffs argue that the Wakkinen study lacks the scientific validity necessary to serve as a basis for the Fish & Wildlife Service's jeopardy determination because it uses a habitat environment in which one third of the studied bears were killed by humans, includes information on a subadult female, and fails to assess whether the bears had any better choices for habitat. They also argue that the status quo in the Recovery Zones is killing bears, and that by failing to require that the Forest Service dramatically improve upon the status quo the Fish & Wildlife Service has shirked its duty under the ESA to ensure that the amendments do not jeopardize the continued existence of the grizzly. The argument is logically compelling and would prevail had Congress given the ESA the teeth necessary to serve its purpose.

The Fish & Wildlife Service was candid about the Wakkinen study's flaws in both the 2001 and 2004 Biological Opinions:

> In their study, Wakkinen and Kasworm (1997) did not determine if bears selected home ranges with fewer roads relative to road densities across the entire ecosystem. . . . Therefore, we are unable to conclude whether the 26 percent and 33 percent for total and open road densities respectively, represents the optimal selection of habitat by bears, or if these numbers simply reflect the condition of the environment from which they have to choose (i.e., do grizzly bears in the Selkirk or Cabinet–Yaak Ecosystems have the opportunity to choose areas with less road density?). . . . An important consideration when interpreting results of the study conducted by Wakkinen and Kasworm (1997), in light of the apparent differences in road densities and core habitats of grizzly bears between the NCDE and the Selkirk/Cabinet–Yaak Ecosystems, is the fact that two of the six female bears in the Selkirk/Cabinet–Yaak study were killed by humans immediately following the period of monitoring, and a third female was the subadult offspring of one of the females in the study.

FWS AR 1 at 40–41; FWS AR 417 at 29 (substantially similar discussion). The Federal Defendants say that in addition to acknowledging these shortcomings, the Fish & Wildlife Service compensated for them by requiring that there be no net loss of core habitat in any bear manage-

---

**15.** The " 'Waynes' numbers" refers to the findings of the Wakkinen study.

ment unit. In the 2004 Biological Opinion the Service states:

[D]ue to the limitations of the research data, and because several [bear management units] may never achieve the minimum habitat conditions suggested by the research as necessary to support the average female grizzly bear's home range within these ecosystems, any permanent losses of core habitat within any [bear management unit] may have serious ramifications on the ultimate recovery of the grizzly bear populations within the Recovery Zones.

FWS AR 1 at 106. In light of this passage, the Fish & Wildlife's Service's requirement of no net loss of core habitat is at least an effort to address the shaky aspects of the Wakkinen study.

The Federal Defendants disagree with the Plaintiffs' contention that the limitations of the Wakkinen study make it unreliable for ESA purposes. They argue that the fact that two of the bears died after the study period does not demonstrate that the habitat studied is insufficient to support the grizzly population because it remains the case that every one of the bears studied survived in the habitat long enough to reproduce and were chosen for that reason. FS AR 19–9 at 4–29. The Defendants cite the Wakkinen authors' statement that "survival and reproductive success must be considered when selecting animals or results which may be the basis for standards." FWS AR 413 at 25. This statement cuts both ways, however, because it values both survival *and* reproductive success: although all six bears lived long enough to reproduce, two did not survive for very long after the study and

neither of the killed females is known to have replaced herself by producing a female cub that reached reproductive age. FWS AR 75 1092–1099. These failures to successfully reproduce undermine the utility of the Wakkinen's study's bears as the basis for standards. On the other hand, one of the females monitored was known to have produced six litters totaling thirteen cubs, including at least three reproductive females, before she died of natural causes at age 21. FS AR 22–16 at 18–19; FWS AR 413 at 28; FWS AR 11 at 405, 407; FWS AR 75 at 1093.

The Federal Defendants also claim that the two human-caused deaths of Wakkinen study bears do not undermine the validity of the authors' findings because the deaths would not have been prevented by lower open road density or higher core percentages. Defendants note that both bears were killed more than five hundred (500) meters from roads open to public motorized travel; one (Bear 867) was killed illegally by a hunter walking on a closed gated road and one (Bear 1015) was killed in a self-defense accident in core habitat in Canada. FWS AR 1092–1093.

The Defendants' argument is misleading with regard to Bear 867, as a road closed by a gate is not sufficiently decommissioned to be considered part of core habitat. FS AR 19–11 at 6.[16] Moreover, the gated road counts toward the calculation of total road density, the one habitat parameter not mentioned by the Defendants. While it is not known to what extent greater protections would have prevented Bear 867's death, there is no question that the death was a product of human-grizzly bear interaction caused by the presence of a

---

**16.** The 2004 Record of Decision states, "Core areas do not include any gated roads but may contain roads that are impassible due to vegetation or constructed barriers." FS AR 19–11 at 6. While it is evident from context that "impassible" is intended to mean impassible

by motor vehicle, and that most "impassible" roads qualifying for inclusion in core habitat would nonetheless be traversable by foot, the site of Bear 867's death is not considered core habitat.

gated road in what would otherwise be core habitat. The death of Bear 1015, by contrast, cannot be attributed to road density or the absence of core habitat.

■ The Wakkinen study is not the best conceivable scientific information upon which to make access management decisions affecting grizzly habitat. Like the plaintiffs in *Alliance*, the Plaintiffs here make the mistake of resting their claim on this fact, which the Federal Defendants readily concede. The issue is whether Wakkinen is the best *available* information, and the Plaintiffs have not carried their burden to show that it is not. The Plaintiffs claim the "best available information" is population trend analysis that suggests that the Cabinet–Yaak and Selkirk populations are teetering on the brink of decline. Pl's Op. Br. at 12. That information, while perhaps accurate, is not so superior in reliability to the Wakkinen study to render the Fish & Wildlife Service's reliance on the study unreasonable.[17] Moreover, unlike the Wakkinen study, the trend analyses cited by the Plaintiffs offer no useful guidance with regard to habitat parameters; they provide a diagnosis but do not suggest a treatment. The Wakkinen study, for all its faults, provides guidance with regard to habitat parameters that can function both as a benchmark for minimum habitat standards and as a guideline for access management decisions.

Plaintiffs characterize the Fish & Wildlife Service's reliance on the Wakkinen study as an instance of high-level agency officials ignoring the recommendations of the agency's own biologists. On that basis they argue that the agency's decisions are not entitled to deference. The Plaintiffs cite *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 685, in which the court wrote, "Although the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts." But here the Fish & Wildlife Service explicitly acknowledged the concerns of these biologists in both the 2001 and 2004 Biological Opinions, and the 2004 Biological Opinion states that the prohibition on net reduction in core habitat is in part an effort to compensate for the shortcomings identified by the biologists. Moreover, the Plaintiffs overlook that one of the two authors of the Wakkinen study is a Fish & Wildlife Service biologist. The Service acknowledged all criticisms and made a choice between conflicting scientific viewpoints among its own biologists.[18] That is a far cry from the situation in *Defenders*, where the court found that the agency "consistently ignored the analysis of its expert biologists" and "bas[ed] its decision on unsupported conclusory statements as well as facts which are directly contradict-

17. The information relied upon by the Plaintiffs as the "best available information" is, like the Wakkinen study, subject to some qualifications. For example, Plaintiffs cite the Service's calculations that there is a seventy-five (75) percent chance that the Cabinet–Yaak population is in decline. FS AR CD 5–12a at 71. This means there is a twenty-five (25) percent chance the population is not in decline.

18. At the hearing on these motions Plaintiffs' counsel argued that there was no evidence of a difference of opinion among Fish & Wildlife Service biologists because Wayne Kasworm,

who co-authored the Wakkinen study, was (according to a telephone conversation record of unknown authorship) silent when another biologist stated that the 2004 Biological Opinion would have been more protective of grizzly habitat were it not for the meddling of officials higher up in the agency. Kasworm's apparent silence on that call does not speak as loudly as his decision to sign off on the Wakkinen study's findings after considering peer review comments raising the same concerns at issue here. The record establishes that the Service's biologists held differing opinions as to the minimum habitat needs of the grizzly bear.

ed by undisputed evidence in the Administrative Record." *Id.*

The Plaintiffs have not provided compelling reason for the Court to refuse to defer to the agency's expertise or for the Court to reverse its finding in the *Alliance* case that it was reasonable for the Fish & Wildlife Service to rely upon the only habitat parameters study based on bears in the management area. The concluding paragraph of the *Alliance* opinion still stands: "Based on review of the administrative record and discussions within it of the shortcomings of the scientific information and the lack of availability of alternate site-specific information, it was not arbitrary and capricious for Defendants to rely on the scientific information included in the record." *Alliance,* CV 04–216–M–DWM at p. 21.

Plaintiffs also argue that by relying on the Wakkinen study and issuing a Biological Opinion that only slightly improves upon the status quo, the Fish & Wildlife Service has failed to ensure that the amendments will not jeopardize the continued existence of the grizzly bear in the Cabinet–Yaak and Selkirk Ecosystems. The Plaintiffs claim that their argument on this issue is distinct from the one rejected in the *Alliance* case because they do not argue that the Service must recover the bears but rather claim that the ESA prohibits the Service from "adopt[ing] standards that threaten grizzly bear extinction." Pl's Op. Br. at 14. Accordingly, the Plaintiffs assert that it does not suffice for the Federal Defendants to declare that the amendments would improve upon current conditions, if only slightly:

> Defendants' grizzly bear plan may marginally improve upon the current degraded status quo in some areas, but its prescription for retention—and even expansion in some areas—of a massive road system in the Cabinet–Yaak and Selkirk ecosystems still would jeopardize the affected bears. By analogy, a medical treatment plan that offers a Band-aid to the victim of multiple severe stab wounds promises a slight improvement on the status quo, but still jeopardizes the victim's continued existence.

*Id.*[19]

Contrary to the Plaintiffs' contention, this argument is merely a restatement of the argument offered by the *Alliance* plaintiffs claiming that the Fish & Wildlife Service must take steps to recover the bears. Legally, the Service need only ensure that a proposed agency action "is not likely to jeopardize the continued existence" of the grizzly. 16 U.S.C. § 1536(a)(2). The implementing regulations further define "jeopardize the continued existence of" to mean "to engage in an action that reasonably would be expected,

---

**19.** Plaintiffs took a different approach at the hearing, arguing that the amendments not only failed to improve upon the status quo, but in fact would degrade the status quo. In support of this argument Plaintiffs' counsel stated that twenty-one (21) of the thirty (30) units would see increases in open motorized road density and thirteen (13) would see increases in total motorized road density. This is an accurate but selective description of the effects of the amendments. *See* FWS AR 1 at 7; FS AR 19–11 at 23 (in fact, it appears that open road density will increase in twenty-two (22) of thirty (30) units, rather than twenty-one (21) as the Plaintiffs say). The amendments will also decrease open road density in four (4) units, decrease total road density in twelve (12) units, and increase core in eleven (11) units. FWS AR 1 at 7. Moreover, they will raise the number of units meeting or exceeding the 33/26/55 standard from eight (8) to twenty (20). *Id.;* FS AR 19–11 at 23. Overall core habitat will increase from fifty-six (56) percent to fifty-eight (58) percent in the Cabinet–Yaak and will remain steady at sixty-four (64) percent in the Selkirk. FWS AR 1 at 103–104. This record supports the agencies' contention that the amendments are a marginal improvement over current conditions for the bears.

directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Context makes clear that the reduction that is prohibited by the ESA is reduction of the current (pre-agency action) likelihood of survival and recovery. The regulations are explicit in requiring the Fish & Wildlife Service to ensure only that the planned action will not make the present situation worse. The Plaintiffs are wrong when they say, "Improvement of the status quo is not the standard; avoidance of jeopardy is the operative legal standard." Pl's Op. Br. at 15. In fact, neither is true. The standard requires not improvement upon the status quo, but rather no deterioration of the status quo. To use the Plaintiffs' analogy, unfortunately the ESA does not require the doctor to treat his stab wound patient; as the law exists it simply requires that the doctor not stab him again.[20]

### b. Failure to Require a Minimum Core Patch Size

 Plaintiffs argue that the Fish & Wildlife Service violated the ESA by failing to establish a minimum core patch size before a patch can be counted toward the core habitat percentage in a bear management unit. In this regard, the Court's tacit agreement with the *Alliance* plaintiffs' statement that the agencies established 2400 acres (about four [4] square miles) as the minimum core patch size is in error; the Federal Defendants here do not dispute that the Fish & Wildlife Service neglected to establish a minimum. Plaintiffs contend that the Wakkinen study demonstrates that core patches smaller than four (4) square miles in area receive little use and that the Service's failure to acknowledge this habitat requirement is a failure to consider an important aspect of the problem in violation of the ESA.

The Plaintiffs argue that it is arbitrary and capricious to fail to establish a minimum core patch size when the Wakkinen study showed that about ninety (90) percent of the habitat use by bears in the Cabinet–Yaak and Selkirk Recovery Zones occurred in core areas measuring ten (10) square miles or greater and ninety-five (95) percent of habitat use occurred in areas of four (4) square miles or greater. FWS AR 413 at 22; FWS AR 331 at 3200. Plaintiffs note that the agencies adopted a four-square mile minimum in the Northern Continental Divide Ecosystem and that the biologists who commented on the Wakkinen draft stated that "[t]here appears to be enough information to support 4 square miles as a minimum core size" and that such a recommendation would be conservative. FWS AR 333 at 3232. The study's authors, however, found that small sample sizes prevented them from identifying a useful minimum core habitat patch size, but noted that "larger blocks of core are likely beneficial to bears" and "if a minimum core size occurs, it is likely be-

---

**20.** A theme has emerged in this Court's ESA rulings: A threatened or endangered animal population is in poor condition. Despite this obvious fact, the Forest Service continues to pursue multiple use management to the detriment of the animals, and the Fish & Wildlife Service acquiesces in planning documents and projects that, to the extent they seek at all to help the imperiled species, are aimed with pinpoint precision toward compliance with the minimum the law requires and nothing more. This Court is then left with little choice but to uphold against an Endangered Species Act challenge agency action that does virtually nothing to help endangered species. Someday it will become clear that the ESA and its implementing regulations are insufficient to recover endangered species. Sadly, that realization will likely come at a·steep price. Dentures are a sorry substitute for teeth in the law.

tween [two square miles and eight square miles]." FWS AR 413 at 25–26.

The Federal Defendants argue that no minimum patch size is necessary because the Wakkinen authors did not set a definitive minimum.[21] The Defendants also claim that the Fish & Wildlife Service addressed the grizzly's preference for larger patches of core by requiring no net reduction of core in any bear management unit. The latter argument can be rejected out of hand. A requirement of no net loss of core habitat coupled with "management flexibility" that allows for shifting of core provided there is no resulting net loss does nothing to ensure a minimum core size. A bear management unit could conceivably be carved into dozens of tiny patches while in the aggregate remaining above the unit's minimum core percentage. Such a unit would meet Wakkinen's habitat parameters while providing none of the large blocks of core that the authors say are "likely beneficial" to the bears. FWS AR at 26.

The Federal Defendants are left with the fact that the Wakkinen study merely hypothesized about a minimum core size and stopped short of identifying one. In this regard, the Plaintiffs point out an inconsistency. The Wakkinen study, while too small to yield a useful minimum core patch size, was large enough to serve as the basis for motorized access management decisions across three national for-

ests. More troubling is the Federal Defendants' failure to cite a single instance of discussion of minimum core patch size in either the 2001 or 2004 Biological Opinions. The Fish & Wildlife Service completely ignored the question of whether there is a minimum useful core habitat size.

Still, the equivocation by the Wakkinen authors creates some doubt as to whether the Service's failure to address the issue can be fairly characterized as a failure to consider an important aspect of the problem. It is more accurate to say that the Service failed to act on a suggestion relating to an aspect of the problem that, while not trivial, is not a pressing issue at this stage. The Plaintiffs identify only two units in which high percentages of core occurring in patches of less than four (4) square miles call into question the effectiveness of the core habitat: Bear Management Unit 6 in the Cabinet–Yaak (fifty-five [55] percent core, one fifth of which is made up of sub-four square mile patches) and the Kalispell–Granite Bear Management Unit in the Selkirk (forty-eight [48] percent core, fourteen [14] percent of which is sub-four square mile patches). FS 19–11 at 9; FWS 331 at 3189. If the Plaintiffs could demonstrate that small core patches make up a significant portion of the available core, the Wakkinen authors' theorizing might warrant greater consideration from the Service. In the

---

**21.** The Federal Defendants also attempt to argue that the Wakkinen study does not support designation of a minimum core patch size because "[f]or most size categories of core areas, there was no statistically significant difference between the grizzly bears' use of such areas and their availability." Defs' Op. Br. at 14. This ignores the Wakkinen study's observation that "[f]emale use percentages in the Selkirks and the Yaak were less than 50% of expected values for the [zero to two square miles] category" and that use percentages only exceeded availability in the [eight to ten square mile and greater than ten square mile categories]. FWS AR 413 at 21. While the Federal Defendants' counsel found *"no statistical difference* between use and availability overall," Def's Op. Br. at 14 (emphasis in original), the biologists saw enough of a difference to suggest that "if a minimum size occurs, it is likely between [two and eight square miles]." FWS AR 413 at 23. The Federal Defendants' argument here is not persuasive because it rests on their counsel's interpretation of the biologists' data and is contrary to the biologists' conclusion.

absence of an indication that small patch sizes are affecting the survival of the grizzly in these ecosystems, the Service's failure to designate a minimum patch size is not grounds for setting aside the Biological Opinions for failure to consider an important aspect of the problem.

Based on the foregoing, the Federal Defendants are entitled to summary judgment in their favor and against the Plaintiffs on the ESA claims (Count I and II).

## C. NEPA Claim (Count III)

### 1. Legal Standard

 NEPA is intended to focus the attention of the government and the public on the likely environmental consequences of a proposed agency action. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Act "places on the agency the obligation to consider every significant aspect of the environmental impact of the proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (citations omitted).

NEPA imposes procedural obligations on government agencies. "NEPA does not work by mandating that agencies achieve particular substantive environmental results." *Marsh,* 490 U.S. at 371, 109 S.Ct. 1851. NEPA dictates the necessary procedure an agency must follow, but does not state any requirements relating to the outcome of the agency's decision making process. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

NEPA requires a federal agency to prepare an environmental impact statement detailing the environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This obligation includes the duty to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). "If several actions have a cumulative environmental effect, 'this consequence must be considered in an [environmental impact statement].'" *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214 (9th Cir.1998) (quoting *Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1378 (9th Cir.1998)).

The environmental impact statement must describe the environmental impacts of the proposed agency action, any adverse environmental impacts of the proposed action that cannot be avoided, and alternatives to the proposed action which were considered by the agency. *Robertson,* 490 U.S. at 349, 109 S.Ct. 1835. The scope and nature of the direct, indirect, and cumulative impacts analysis is a matter committed to the sound discretion of the agency. *Kleppe v. Sierra Club,* 427 U.S. 390, 413–14, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). If the nature and scope of the analysis is challenged, the reviewing court may only examine whether "the agency has taken a 'hard look' at the environmental consequences." *Inland Empire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754, 763 (9th Cir.1996) (quoting *Kleppe,* 427 U.S. at 410 n. 21, 96 S.Ct. 2718). A court may not interject itself within the area of discretion of the executive as to the choice of the action to be taken; only if the agency's analysis of the environmental impact is "arbitrary and capricious" or "contrary to the procedures required by law" can the reviewing court conclude that the agency did not take the requisite "hard look." *Kleppe,* 427 U.S. at

410 n. 21, 96 S.Ct. 2718; *Inland Empire,* 88 F.3d at 763.

## 2. Relevant Excerpt of the *Alliance* Opinion

The Plaintiffs in the *Alliance* case raised a NEPA challenge to the 2002 Final Environmental Impact Statement and 2004 Record of Decision similar to the one alleged in Count III here. The relevant excerpt of the *Alliance* opinion states:

1. Scientific Integrity of EIS Analysis

40 C.F.R. § 1502.24 directs agencies to insure the scientific integrity of their EIS analyses, identify any methodologies used, and make explicit reference to sources relied upon. Plaintiffs argue that the EIS must point out incomplete or weak sources of information, citing *Lands Council v. Powell,* 395 F.3d 1019, 1031 (9th Cir.2005). The Wakkinen report, in Plaintiffs' view, is just such a weak source, and Plaintiffs believe the EIS should more fully discuss the report's shortcomings. Plaintiffs' argument and quotations of criticisms of the Wakkinen Report emphasize that Wakkinen's figures reflect the degraded status quo, with the implication that since the bears are not doing well now, maintenance of the status quo is not an improvement. Defendants reject Plaintiffs' reliance on *Lands Council,* arguing that the Wakkinen Report is not a model, like the WATSED model at issue in *Lands Council,* but rather a collection of data regarding grizzly habitat use in the very area the agencies are trying to manage through the Plan Amendments.

The objective, "to insure the scientific integrity of the analysis," is vague, and the case law does not provide much guidance about what it means. Generally, courts have interpreted this phrase to mean that analysis cannot be based on faulty information or flawed models. *See, e.g., Native Ecosystems Council v.*

*U.S. Forest Serv.,* 418 F.3d 953 (9th Cir.2005).

As a preliminary matter, Defendants are incorrect that *Lands Council* does not apply in a case that involves a collection of data rather than a model. *Lands Council* reiterated the NEPA requirement of "up-front disclosures of relevant shortcomings in the *data* or models." 395 F.3d at 1032 (emphasis added). Thus, the *Lands Council* reasoning is applicable in this case. Nevertheless, *Lands Council* does not dictate a finding in Plaintiffs' favor on this issue. In *Lands Council,* the Forest Service's WATSED model was inadequate because it did not include some variables determined to be crucial. *Id.* at 1031. The bottom line of that case, however, is that if the agency knows something is wrong with its model or data, it must disclose that fact.

Similar to *Lands Council,* in *Earth Island Institute v. U.S. Forest Service,* 351 F.3d 1291 (9th Cir.2003), the Ninth Circuit emphasized how important it is for an agency to disclose the scientific information upon which it has relied so that the public may challenge its reliance on that information:

Failure to provide [scientific] information either vitiates a plaintiff's ability to challenge an agency action or results in the courts second guessing an agency's scientific conclusions. However, an agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints. Because analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies. When specialists express conflicting views, an agency must have discretion to rely on the reasonable

opinions of its own experts, even if a court may find contrary views more persuasive. At the same time, courts must independently review the record in order to satisfy themselves that the agency has made a reasoned decision based on its evaluation of the evidence.

*Id.* at 1301 (internal quotation marks and citations omitted).

In the end, the FEIS in this case provides enough information about the shortcomings of the Wakkinen study to allow someone to perceive its weaknesses and to challenge the agency's action. The record also includes information about various criticism's of the Wakkinen information, such that an interested member of the public would be able to analyze the study knowingly. At the same time, the Forest Service articulated a reasonable explanation for why it relied on the information. The Forest Service sufficiently maintained the scientific integrity of the EIS by making a reasonable decision about the Wakkinen study and providing the public with sufficient information in the EIS to understand that there is a deficit of local grizzly information available to them.

\*　\*　\*　\*　\*　\*

### 3. Reasonable Range of Alternatives

NEPA requires agencies to study, develop, and describe appropriate alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. § 1502.14. Plaintiffs allege the Forest Service failed to include an alternative that would "improve habitat conditions to protect and recover these populations."

All alternatives were based on the Wakkinen Report's standards of 55% core habitat, 33% open road density, and 26% total road density. The most protective of the original proposals, Alternative D, was eventually removed from the final version. Alternative D would have cleaved to the Wakkinen Report's maximum habitat security figures, rather than its averages. Standards would be set at 72% core habitat, 17% open road density, and 14% total road density. Plaintiffs consider this alternative "reasonable" and contend it should have been considered.

Defendants respond that their NEPA obligation is only to consider reasonable choices, and that Plaintiffs failed to provide a reasonable option that was not considered by the Forest Service. Defendants claim Alternative E would be more protective in fourteen of thirty BMUs than the Wakkinen Report would require. In addition, Defendants argue that Alternative D was impossible because it required the closing of all roads under Forest Service jurisdiction, and even then, several of the BMUs could not reach the proposed standard. Finally, citing *Department of Transportation v. Public Citizen*, 541 U.S. 752, 764–65, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004), Defendants contend that plaintiffs who fail to raise specific alternatives during the NEPA process forfeit the objection that the NEPA analysis failed to consider potential alternatives.

"The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 575 (9th Cir.1998) (quoting *Robertson*, 35 F.3d at 1307) (internal quotation marks omitted). However, the EIS need only consider reasonable alternatives, not every conceivable alternative. *See* 40 C.F.R. § 1502.14(a). "The touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *California v. Block*, 690 F.2d 753, 767

(9th Cir.1982). The Ninth Circuit applies a "rule of reason" to this review, asking "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 810 n. 27 (9th Cir.2005) (quoting *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir.2001)).

The issue here is whether the former Alternative D was a reasonable choice that should have been considered in the FEIS. The Forest Service ran a model to determine whether Alternative D was feasible and concluded that there were not enough roads to close in federal jurisdiction to make Alternative D possible. FS AR 19–9 at 4–177–78, 4–180. The FEIS responds to extensive public comment lobbying for a stricter standard and for Alternative D. The FEIS explains why Alternative D was not feasible and why Alternative E was a reasonable compromise. The record demonstrates that the Forest Service engaged in a reasonably thorough discussion of Alternative D during the public comment period and reasonably concluded that Alternative E was a better selection. Its choice was not arbitrary and capricious.

\*　　\*　　\*　　\*　　\*　　\*

5. Risk and Uncertainty of the Chosen Alternative

Plaintiffs contend that the EIS fails to disclose the high risk of extinction of the grizzly bears and the scientific uncertainty about whether the chosen alternative will alleviate this risk. The small population of bears may face as high as an 85% chance of extinction. Plaintiffs believe the EIS should have made this clear to the public, who may then have demanded greater protection for the bears. Also, Plaintiffs point to what they consider increasing grizzly mortality in recent years, since thirteen bears died in the Cabinet–Yaak in the three years leading up to the 2002 EIS, yet none of those deaths were mentioned in the EIS. FS AR 90:14. Plaintiffs believe the EIS should have disclosed that bear biologists believed that other alternatives were better than Alternative E for bears. FS AR 19:11 at 12; FWS AR 231 & 225.

Defendants point to discussions of these issues in the EIS at FS AR 19:9 at 3–6, Figure 3–1, 3–8, 1–4, 3–10, 3–18–3–21, and generally to the proposition that "in determining whether the EIS contains a reasonably thorough discussion, we may not fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies." *Friends of Southeast's*, 153 F.3d at 1063. Defendants reiterate their goal of contributing to the conservation of grizzly bears and state that road management is only one factor in the process. Defendants also argue that the Forest Service has never represented to the public that Alternative E would lead to grizzly recovery.

This last point is crucial. The FEIS explains that grizzly bears are in trouble and explains that the Plan Amendments will slightly improve their habitat conditions. The FEIS does not state that all problems for the bears will be solved by these Amendments. The FEIS's purpose, to establish road standards, does not encompass doing everything possible to prevent harm to grizzlies. The Forest Service's choice in the FEIS is not arbitrary, given that FWS determined the Amendments do not jeopardize the continued existence of the bears. Having said this, it will be a sad day indeed if these bears become extinct because of a "Grover Norquist" thought processes

invading the agency decision-making process.[22]

*Alliance,* CV 04–216–M–DWM at pp. 25–35.

### 3. Discussion

The Plaintiffs argue that the Forest Service's 2002 Final Environmental Impact Statement violates NEPA in three ways. First, Plaintiffs contend the Forest Service failed to consider a reasonable range of alternatives for access management because it did not consider in detail any alternative that would be more protective of grizzly bear habitat than the Wakkinen study's 33/26/55 standard. Next, the Plaintiffs argue that the Forest Service failed to investigate further to determine whether there is any truth to the Wakkinen authors' speculation that perhaps the habitat use they measured is not indicative of what the grizzlies need to survive but instead merely reveals the grizzlies' choice of the best available habitat in a degraded environment. Finally, the Plaintiffs say the Forest Service violated NEPA by failing to supplement its environmental analysis after learning of human caused grizzly mortalities in 2003. Each argument is discussed in turn below.

#### a. Failure to Consider a More Protective Alternative

The Plaintiffs argue that the Forest Service violated NEPA by failing to consider any alternative road management plan that would be more protective of grizzly bear habitat than the Wakkinen 33/26/55 standard. In addition to the chosen Alternative E, other alternatives considered in detail were Alternatives A (the legally required "no action" option), B (continued adherence to the Cabinet–Yaak/Selkirk Subcommittee's interim rules), and C (33/26/55 standard for every unit made up of at least seventy-five [75] percent federal land). FA AR 19–9 at 2–6 to 2–17. Three alternatives not given detailed study were Alternatives D (increased security habitat achieved by implementing a 17/14/72 standard for all units comprised of at least seventy-five [75] percent federal land), F (maintenance of current access levels) G (maximum access). *Id.* at 2–18.

The Plaintiffs here say their argument is distinct from the one rejected in *Alliance* because they do not focus, as the *Alliance* plaintiffs did, on the Forest Service's failure to develop Alternative D in greater detail. Instead, the Plaintiffs here argue that the Forest Service violated NEPA by "fail[ing] to consider *any* alternative that would have established higher minimum security requirements—even an alternative that would not have been as protective as Alternative D." Pls' Op. Br. at 21 (emphasis in original). Elsewhere the Plaintiffs make clear that by "higher minimum security requirements" they mean requirements in excess of the Wakkinen study's 33/26/55 standard, stating, "Conspicuously absent from the Forest Service's analysis was any alternative establishing minimum habitat security levels more protective of grizzly bears than those observed in the Wakkinen–Kasworm study." *Id.* at 20–21.

The Plaintiffs' argument is based on a mischaracterization of Alternative E. The Plaintiffs argue as though Alternative E prescribed "one size fits all" adherence to the 33/26/55 standard across all bear management units, and accuse the Forest Service of running afoul of *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982), by " 'uncritically assum[ing]' that nothing more than the 33/26/55 Wakkinen–Kasworm should be utilized." This statement is not accurate. An across-the-board

---

**22.** [Footnote 8 in the *Alliance* opinion] "I don't want to abolish government. I simply want to reduce it to the size where I can drag it into the bathroom and drown it in the bathtub." (Citation omitted.)

33/26/55 alternative was presented as Alternative C and was rejected after detailed consideration.[23] The chosen Alternative E sets individual habitat parameters for each affected bear management unit, including standards that are more protective than the Wakkinen parameters in thirteen (13) of the thirty (30) affected bear management units and equal to the Wakkinen parameters in another seven (7). FS AR 19–11 at 23. The Final Environmental Impact Statement states that the chosen Alternative E "provides an overall higher level of habitat security than Alternative C and therefore should go farther towards insuring that the species will not be jeopardized." FS AR 19–9 at 3–20. The Plaintiffs' statement that the Forest Service did not consider any alternative more protective than 33/26/55 is inaccurate; the Service not only considered a more protective alternative, it adopted that alternative. The argument that the Service should have considered other possible habitat parameters (besides 33/26/55) as potential bases for alternatives is unavailing because it did not use 33/26/55 as the basis for the chosen Alternative E.

If this aspect of the Plaintiffs' NEPA claim is to succeed, it must be because the Service failed to consider an option that would set individual habitat parameter standards for each bear management unit—like Alternative E—but would have been more protective in each unit than Alternative E. There is no "one size fits all" standard that is more protective than the Wakkinen study that can feasibly be implemented across all bear management units.[24] This means that the Plaintiffs are left with no option but to argue that the Forest Service should have considered an alternative setting unit-by-unit standards more protective than those set by Alternative E. Plaintiffs attempt to do so by identifying nine bear management units in which the Forest Service could conceivably have considered more protective standards than those considered in Alternative E with regard to at least one of the three habitat parameters.

 The Federal Defendants respond by claiming that the Plaintiffs' more protective standards, while conceivable, are not practical. A party challenging a final environmental impact statement for failure to consider all alternatives must "introduce specific, evidentiary facts in support of their contention that the final EIS improperly failed to consider reasonable and viable alternative[s]." *Friends of the Earth v. Coleman,* 513 F.2d 295, 298 (9th Cir.1975). The Defendants say the Plaintiffs have failed to carry their burden here because their proposed unit-by-unit standards would be infeasible where they would require, for example, the closure of popular arterial Forest Service roads for social and recreational opportunities in the Troy, Montana, area, FS AR 1–95 at 77, or the permanent closure of roads near private timber lands to which the Forest Service legally must permit access. FS AR 1–95 at 102. These considerations are non-trivial, the Defendants say, in light of the Interagency Grizzly Bear Committee's

---

**23.** Of Alternative C the Forest Service said, "Though at minimum levels, it is believed that this alternative would avoid the jeopardy criteria of [ESA] Section 7(a)(2)." FS AR 19–9 at 3–20.

**24.** Alternative D would have set an across-the-board standard of 17/14/72 for all bear management units and was abandoned as impossible because of the lack of federal juris-diction to close private, state and county roads as necessary to achieve the standard. FS AR 19–9 at 4–177 to 4–178. An across-the-board standard of 19/19/68 (based on the South Fork study in the Northern Continental Divide Ecosystem) is similarly unachievable under the current land ownership distribution, as the Plaintiffs concede. Pls' Op. Br. at 24–25.

directive in its Task Force Report, incorporated into the "Purpose and Need" portion of the 2002 Final Environmental Impact Statement, that road management and core parameters be established "using the best biological information and considering social and economic impacts." FS AR 19–9 at 1–4. A federal agency does not act unreasonably when it rejects an alternative "on the ground that it would not meet the purpose and need of the proposed project," *Friends of the Southeast's Future v. Morrison*, 153 F.3d 1059, 1067 (9th Cir.1998), nor is it required to "consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters v. Bureau of Land Management*, 914 F.2d 1174, 1180 (9th Cir.1990). The Plaintiffs have identified a conceivable alternative, but as the Defendants point out, they offer no citations to the record explaining that their proposed alternative is reasonable or viable.

 More problematic for the Plaintiffs is the fact that their proposed unconsidered alternative is not that different from Alternative E. "An agency is required to examine only those alternatives necessary to permit a reasoned choice." *Association of Public Agency Customers v. Bonneville Power Administration*, 126 F.3d 1158, 1185 (9th Cir.1997). The agency's analysis need not "include every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). "NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Headwaters*, 914 F.2d at 1181. The Plaintiffs' proposed alternative cannot meet this standard of separateness to warrant distinct consideration. In essence, the Plain-

tiffs say the Forest Service should have considered a modified Alternative E with some or all of the habitat parameters changed for nine (9) of the thirty (30) affected bear management units.

If NEPA requires detailed consideration of an alternative that tweaks the habitat parameters in less than a third of the affected units but is otherwise identical to the one chosen, there is no end to the possibilities that the Forest Service must consider. The Plaintiffs will always have room to say that the Service could have considered something more protective of grizzly habitat. But a more protective "one size fits all" standard is impossible, and a more protective unit-by-unit standard is not so different from Alternative E as to require detailed consideration.

The Plaintiffs have not shown that the Forest Service acted unreasonably in setting the range of alternatives to be considered for the proposed access management amendments. Summary judgment is appropriate in favor of the Defendants and against the Plaintiffs on this aspect of the NEPA claim (Count III).

### b. Failure to Address the "Information Gap" in the Wakkinen Study

The authors of the Wakkinen study noted the higher degree of security found in the South Fork study and offered as one possible explanation for the discrepancy the notion that perhaps the bears in the Wakkinen study were not selecting optimal habitat but were choosing the best habitat available in a degraded landscape. FWS AR 413 at 24. The authors reported that they could not test this hypothesis "[w]ithout a comparison of a large area (first order selection)." *Id.* at 24–25. The Plaintiffs call this a "critical information gap" that the Forest Service failed to ad-

dress as required by NEPA. Pls' Op. Br. at 25.[25]

NEPA's implementing regulations require agencies to rely upon high quality scientific information and accurate scientific analysis. 40 C.F.R. § 1500.1(b). If information that is relevant to reasonably foreseeable significant adverse impacts of an action and is essential to a reasoned choice among alternatives, the action agency should include the information, if possible, in its environmental impact statement. 40 C.F.R. § 1502.22(a). If the information is unavailable because the cost of obtaining it is too great or the means to obtain it are unknown, the environmental impact statement must include:

> (1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

40 C.F.R. § 1502.22(b).

The Plaintiffs say the Forest Service violated NEPA by failing either to obtain the missing information or to "acknowl-

edge the information gap and apply theoretical approaches or research methods generally accepted in the scientific community to fill the void." Pls' Op. Br. at 28 (internal quotation marks omitted). The Defendants retort that the Forest Service fulfilled its duty under NEPA by acknowledging, in response to public comments, the Wakkinen authors' uncertainty about the availability of more protective habitat for the studied bears and by explaining its conclusion that the doubts about habitat quality left open by the Wakkinen authors are, in the Service's estimation, assuaged by the fact that every female bear studied survived long enough to reproduce in the conditions studied. *See* FS AR 19–9 at 4–29 to 4–30, in which the Forest Service states, "These 6 bears were chosen because they were females that had survived long enough to provide sufficient data for the analysis and had reproduced within the study area."

 The claim that the Defendants acknowledged the issue is suspect. The record reveals that they did not take a hard look at the critical information gap in the science they adopted. The Defendants fail to offer a single citation to the Final Environmental Impact Statement in which the Forest Service discusses the question posed by the Wakkinen authors. The only acknowledgment of the issue comes in a response to public comment referring to "the already seriously degraded condition of the recovery area." *Id.* at 4–29.

On the other hand, the Plaintiffs' characterization of the Service's obligation under NEPA goes further than the regulations require. The Forest Service is not, as the Plaintiffs imply, obligated to use theoretical approaches or research methods to learn the answer to the question posed by

---

**25.** Although the Plaintiffs assert that the Court did not consider this argument in *Alliance,* the issue is related to those addressed in the *Alliance* discussion excerpted on pages 46–47, *supra.*

the Wakkinen authors. The duty of the agency is to use theories or research methods to assess the impacts of the proposed action in the absence of an answer to that question. 40 C.F.R. § 1502.22(a), (b). The record shows that the Forest Service used available data to explore the potential impacts and articulated the basis for its decision. This is sufficient to satisfy 40 C.F.R. § 1502.22(b)(3) and (4).

However, the Forest Service entirely failed to meet the requirements of 40 C.F.R. § 1502.22(b)(1) and (2), which dictates that the agency's discussion acknowledge the missing information and include "a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment." The Federal Defendants have cited nothing in the Final Environmental Impact Statement purporting to meet these requirements. The failure to the Forest Service to attempt any assessment of the importance of the missing information calls into question the validity of the Service's conclusions about the impacts of the proposed action. The Forest Service cannot simply rely on Wakkinen as the best scientific information available; it must acknowledge and discuss any flaws.

The obligation to disclose and compensate for missing information is triggered only where the information is "essential to a reasoned choice among alternatives." 40 C.F.R. § 1502.22(a). Given the statements of the Wakkinen authors, the misgivings of other biologists about the range of habitat choices available to the bears, and the ongoing mortality problems in these populations, there can be no reasoned choice among alternatives and no accurate prediction of the impact of the proposed action until the Forest Service has assessed the

importance of the missing information. Because of this flaw, the Final Environmental Impact Statement will be set aside and the matter remanded to the Forest Service for preparation of a new environmental impacts analysis that complies with 40 C.F.R. § 1502.22(a) and (b).

### c. Failure to Supplement the Environmental Analysis

 On September 21, 2006, the Court granted the Defendants' motion to supplement the administrative record with a letter from Fish & Wildlife Service Field Supervisor Mark Wilson to Kootenai National Forest Supervisor Bob Castaneda dated December 7, 2004. The letter acknowledges the Forest Service's request for re-initiation of consultation on the effect of the Rock Creek Mine project in light of the discovery of the death of a female grizzly and, presumably, her three cubs in the Cabinet–Yaak Ecosystem.[26] The Plaintiffs argue that the Forest Service's failure to supplement its analysis on the Lolo/Kootenai/Idaho Panhandle access amendments violates NEPA.

This argument is controlled by the United States Supreme Court's decision in *Norton v. SUWA,* 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). Citing its decision in *Marsh,* 490 U.S. at 374, 109 S.Ct. 1851, the Supreme Court stated that "supplementation is necessary only if there remains 'major federal action' to occur, as that term is used in [42 U.S.C.] § 4332(2)(C)." *Norton,* 542 U.S. at 73, 124 S.Ct. 2373 (internal quotation marks omitted). The Court held that "although the *approval* of a land use plan is a major Federal action requiring an EIS, that action is completed when the plan is approved. The land use plan is the 'pro-

---

**26.** The Plaintiffs state that the bears were killed by a human, Pls' Op. Br. at 28, but the letter does not say how the bears died. Nor is it clear from the letter whether the deaths were related to the Forest Service's management of roads.

posed action' contemplated by the regulation. There is no ongoing 'major Federal action' that could require supplementation...." *Id.* (citation, internal quotation marks omitted; emphasis in original). The Court contrasted the situation in *Marsh,* where supplementation was required under NEPA because the dam project was ongoing. *Id.*

Like the land use plan in *Norton,* the programmatic Forest Plan amendments at issue here do not require supplemental environmental analysis once they are adopted. The Record of Decision states that the amendments "[do] not make site-specific access management decisions" and that such decisions "will be proposed through future project-level planning." FS AR 19–11 at 1; *see also Id.* at 5. The Plaintiffs attempt to distinguish *Norton* by stating that the Forest Plan amendments adopted in this case "contain[ ] binding prescriptions for road management in specific [bear management units]," Pls' Reply Br. at 14, but the Plaintiffs do not cite any portion of the record in support of their argument. The Forest Plan amendments require that future actions move toward the new standards and establish incremental milestones for compliance, FWS AR 1 at 135, but the amendments do not require that any particular project be done. FS AR 19–11 at 5. Because the plan amendments are the "proposed action," NEPA does not require a supplemental environmental analysis.

Summary judgment in the Defendants' favor is warranted on this aspect of the Plaintiffs' NEPA claim (Count III).

### IV. Order

Based on the foregoing, IT IS HEREBY ORDERED that the Plaintiffs' motion for summary judgment (Doc. No. 44) is GRANTED, and the Federal Defendants' motion for summary judgment (Doc. No. 46) is DENIED with regard to the Plaintiffs' NEPA claim (Count III) for failure to address the missing information in the Wakkinen study. The Federal Defendants' motion for summary judgment (Doc. No. 46) is GRANTED, and the Plaintiffs' motion for summary judgment (Doc. No. 44) is DENIED, with respect to all other claims (Counts I, II and III).

IT IS FURTHER ORDERED that the 2002 Final Environmental Impact Statement and 2004 Record of Decision are set aside as contrary to law and that this matter is remanded to the United States Forest Service for preparation of a new environmental analysis that complies with 40 C.F.R. § 1502.22(a) and (b). Specifically, the analysis must acknowledge that the Wakkinen study's authors were unsure whether the bears they studied had chosen optimal habitat or whether they simply chose the best habitat available from a degraded landscape. The analysis must assess the relevance and importance of this flaw in the Wakkinen study. In so doing, the analysis must take into account the misgivings of Fish & Wildlife Service biologists over the 33/26/55 standard, the findings of other studies measuring habitat parameters in other ecosystems, and the state of grizzly bear mortality in the Cabinet–Yaak and Selkirk Recovery Zones.